**Frank A. PRETTER, Sr. Plaintiff,**

v.

**METRO NORTH COMMUTER RAILROAD COMPANY, Defendant.**

**No. 00 CIV. 4366(JSR).**

United States District Court, S.D. New York.

June 20, 2002.

---

Thomas J. Joyce, III, Don P. Palmero, Jr., Hannon & Joyce, Philadelphia, PA, Glenn L. Kantor, O'Hagan & Reilly, P.C., East Islip, NY, for Plaintiff.

Jose Rios, Metro North Commuter Railroad, New York City, for Defendant.

## MEMORANDUM

RAKOFF, District Judge.

By order dated December 28, 2001, the Court granted the motion of defendant Metro North Commuter Railroad Company ("Metro North") to strike the proposed trial testimony of plaintiff's "ergonomics" expert, Robert Andres, and stated that an opinion would follow giving the reasons for the ruling. With apologies for the inordinate subsequent delay, the Court hereby fulfills that commitment.

Plaintiff Frank A. Pretter Sr. alleges that he and fourteen other Metro North employees developed carpal tunnel syndrome and other disabilities as a result of Metro North's negligence in requiring the employees to perform unduly repetitive tasks at a Metro North repair facility called the "Harmon Shop." In support of their respective claims,[1] Pretter duly filed an expert report from Dr. Andres, an ergonomist. Following challenge by the defendant, the Court, after receiving a Report and Recommendation from Magistrate Judge Eaton, conducted a two-day evidentiary hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), following which the Court, as noted, granted defendant's motion to strike Dr. Andres' testimony.

As set forth in his report, Dr. Andres proposes to testify at trial that he holds the following seven "professional ergonomic opinions" to a "reasonable degree of scientific certainty":

"1. The jobs performed by these 15 plaintiffs exposed them to sufficient

---

1. On consent of all concerned, this Memorandum also applies to fourteen additional plaintiffs in parallel cases bearing docket numbers: 00 Civ. 4367(SWK), 00 Civ. 4404(WHP), 00 Civ. 4405(AKH), 00 Civ. 4406(LMM), 00 Civ. 4764(RCC), 00 Civ. 4765(NRB), 00 Civ. 4766(SHS), 00 Civ. 4767(GBD), 00 Civ. 4768(GBD), 00 Civ. 5199(SHS), 00 Civ. 5200(LMM), 00 Civ. 5203(JSR), 00 Civ. 5204(KMW) and 00 Civ. 5210(SHS). Nine of those actions—specifically, 00 Civ. 4367, 00 Civ. 4404, 00 Civ. 4405, 00 Civ. 4764, 00 Civ. 4767, 00 Civ. 4768, 00 Civ. 5200, 00 Cv. 5203, and 00 Civ. 5204—have been consolidated for trial before this Court together with the instant action. Additionally, the actions assigned docket numbers 00 Civ. 5199 and 00 Civ. 5210 have been consolidated for trial before Judge Stein, and those numbered 00 Civ. 4406 and 00 Civ. 4766 have similarly been consolidated for trial before Judge McKenna, leaving only the case assigned number 00 Civ. 4765 to be tried individually before Judge Buchwald.

amounts of the documented ergonomic risk factors for the upper extremity (force, repetition, awkward posture, mechanical stress concentrations, and vibration) to be consistent with the development of CTS [*i.e.*, Carpal Tunnel Syndrome].

2. MNCR [*i.e.*, Metro North] should have known that their employees were being exposed to ergonomic risk factors for CTS by the mid 1980s, or at the very latest upon the arrival of Dr. Go in the Medical Department in 1993.

3. MNCR was negligent by not performing worksite and job evaluations for ergonomic risk factors in the Harmon Shop.

3[*sic*]. MNCR was negligent for not implementing engineering controls or administrative controls to minimize these employees' exposure to ergonomic risk factors for the upper extremity.

4. MNCR was negligent by not providing adequate training to these 15 plaintiffs to empower them to minimize their exposure to ergonomic risk factors, or to allow them to recognize early signs and symptoms of upper extremity musculoskeletal problems so that they could report them.

5. MNCR was negligent for not implementing a medical management program to treat and control work related musculoskeletal disorders and for not encouraging the early reporting of signs and symptoms of upper extremity problems.

6. MNCR was negligent for not providing a timely and adequate Ergonomics Program for these employees to prevent occupational CTS."

*Report in the Matters of Bashant et al. v Metro–North Commuter Railroad* ("Andres Report"), at 16.

Precisely because they purport to be matters of "scientific certainty," all but the first of these opinions are deficient on their face. Whether, for example, Metro North "should have known" by the mid–1980's that its employees were being "exposed to ergonomic risk factors" (opinion "2"), or whether Metro North was "negligent" for "not performing worksite and job evaluations for ergonomic risk factors" (the first of the two opinions numbered "3") are, by their very nature, matters not reducible to scientific certainty and any attempt to pretend otherwise is calculated to confuse and mislead the jury. This is not to say that scientific information might not be relevant to some of the issues addressed in these opinions (although not necessarily in areas of Dr. Andres' expertise); but neither Dr. Andres nor his clients so limit his opinions, but rather proffer that the opinions as a whole are held "to a reasonable degree of scientific certainty" when, in fact, they are mostly not matters of science at all.

While the same deficiency does not apply to opinion "1", that opinion suffers from other fundamental flaws that render it inadmissible under *Daubert*. To begin with, in its stated form the opinion is so vague as to be meaningless. What does it mean for a job to "expose" a worker to "sufficient" amounts of ergonomic risk factors to be "consistent" with the development of CTS? More fundamentally, as the evidentiary hearing before this Court confirmed, this vagueness is not the result of imprecise wording, but of imprecise methodology and inadequate investigation. For example, even though at the hearing Dr. Andres testified that the two "ergonomic risk factors" most applicable to plaintiffs' work were frequent repetitions and the exertion of high levels of force, he neither defined these factors with specificity nor offered any objectively measured evidenced of the frequency with which Metro North employees repeated their job func-

tions or the levels of force they employed. *See, e.g.,* transcript of *Daubert* hearing ("tr.") at 52, 54, 133–135. Instead, he chose to rely on impressions and extrapolations derived from his brief and casual visual inspection and videotaping of the work functions at issue. *See, e.g.,* tr. at 47. While his conceded failure in this regard to follow the protocol of the National Institute for Occupational Health and Safety for videotaping workplace performance for purposes of analyses, *see, e.g.,* tr. at 126–132, may not be fatal in itself, substantially closer observation and quantitative measurement would be necessary before his opinion "1" could meet the most elementary requirements of "scientific certainty," such as precision, reliability, and falsifiability. *See Daubert,* 509 U.S. at 591–95, 113 S.Ct. 2786; *see also Stasior v. National Railroad Passenger Corp.,* 19 F.Supp.2d 835, 851–52 (N.D.Ill.1998).

These deficiencies, moreover, were exacerbated, rather than cured, by the only other "empirical" data on which Dr. Andres relied, to wit, plaintiffs' own vague, conclusory, and self-serving statements. *See* tr. 47, 54, 138. Indeed, while the Court, in reaching its conclusions herein, has ignored the testimony of defendant's expert and eschewed any evaluation of Dr. Andres' own credibility,[2] the Court does take cognizance of Dr. Andres' acknowledgment that reliance on such subjective "data" is palpably problematic in reaching "scientific" conclusions. *See, e.g.,* tr. 101–104; *see also, Proceedings of the Human Factors Society 35th Annual Meeting 1992* at 790. One who seeks to clothe his opinions in the garb of "scientific certainty" must adhere to the strict standards of objectivity that that formal wear entails.

In addition to his seven "opinions," Dr. Andres also proposes to testify to five "conclusions," as follows:

1. These 15 employees of MNCR all have a work history consistent with exposure to ergonomic risk factors.

2. These employees have been exposed to forceful hand intensive work in their job tasks. Many of their job tasks involved exposure to more than one ergonomic risk factor simultaneously—the situation with the strongest association with CTS.

3. None of the plaintiffs ever received ergonomics training beyond safety meetings or on the job. They were not trained to recognize ergonomic risk factors in their jobs or how to minimize their effect. They were not trained to recognize early symptoms of musculoskeletal disorders, nor were they encouraged to report these symptoms at their onset.

4. MNCR has not performed a worksite or job analysis of the jobs that these employees performed.

5. Communications between the Safety Department, the Medical Department, and the Claims Department are totally ineffective—to the point that directors of these departments think that another department besides their own is making the decision about whether an injury is occupational or not.

Andres Report at 15–16. Conclusions "3", "4", and "5" are assertions of fact as to which Dr. Andres has no personal knowledge; moreover, they in no way relate to Dr. Andres' scientific expertise. They are therefore inadmissible on their face. Conclusions "1" and "2" suffer from the same vagueness and methodological deficiencies already discussed in connection with Dr.

---

**2.** *But see, Elcock v. Kmart Corporation,* 233 F.3d 734, 751 n. 8 (3d Cir.2000) (credibility

determination may be relevant to determining the appropriateness of expert's methodology).

Andres' "opinions" and are similarly inadmissible for those reasons.

In short, for the foregoing reasons, Dr. Andres' proffered testimony is stricken in its entirety and will not be permitted at trial. Upon receipt of this Memorandum, counsel should jointly call Chambers to schedule the trial date for this action and the other nine cases with which it has been consolidated.