J-A02041-17

2017 PA Super 368

| MIKE BUTTACCIO | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| AMERICAN PREMIER UNDERWRITERS, INC., FORMERLY KNOWN AS PENN CENTRAL CORPORATION, INDIVIDUALLY AND/OR AS SUCCESSOR-IN-INTEREST-OR-LIABILITY TO PENN CENTRAL TRANSPORTATION COMPANY, THE PENNSYLVANIA NEW YORK CENTRAL RAILROAD COMPANY, AND/OR THE PENNSYLVANIA RAILROAD, CONSOLIDATED RAIL CORPORATION AND CSX TRANSPORTATION, INC., | |
| Appellants | No. 1602 EDA 2016 |

Appeal from the Judgment Entered April 27, 2016
in the Court of Common Pleas of Philadelphia County Civil Division
at No(s):May Term 2014 No. 2115

BEFORE: OTT, RANSOM, and FITZGERALD,* JJ.

OPINION BY FITZGERALD, J.:                    **FILED NOVEMBER 16, 2017**

Appellants, American Premier Underwriters, Inc. ("Penn Central"), Consolidated Rail Corporation ("Conrail"), and CSX Transportation, Inc. ("CSX") (collectively referred to as "Appellants" or "the railroads"), appeal from a judgment of $597,000.00 entered in favor of Appellee, Mike Buttaccio, in this personal injury action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60. Appellants argue that the trial

_____

* Former Justice specially assigned to the Superior Court.

court abused its discretion by denying their motion to exclude the testimony of Appellee's liability expert on the ground that his methodology is not generally accepted in the field of ergonomics. Second, Appellants request a new trial on the grounds that counsel for Appellee repeatedly violated the trial court's order precluding evidence and argument about the manpower that Appellants provided, and counsel made a highly prejudicial comment that "'two employees of CSX were killed'" in an unrelated accident. Appellants' Brief at 42. Finally, Appellants contend that the trial court erred by permitting Appellee's liability expert to introduce evidence that Appellants "received 'thousands of claims [from other employees] for carpal tunnel syndrome and lower extremity disorders and upper extremity disorders as well.'" *Id.* at 43.

We hold that the trial court acted within its discretion in determining that the methodology of Appellee's liability expert was generally accepted in the field of ergonomics. We conclude, however, that Appellants are entitled to a new trial because of Appellee's counsel's violations of the preclusion order and prejudicial remark concerning the death of two CSX employees. With regard to Appellants' final argument, we direct the trial court to hold an evidentiary hearing on remand as to the admissibility of Appellee's "other claims" evidence.

Appellee brought this action against his railroad employers to recover for his occupational injuries and economic damages. Appellee began his

employment in 1973 as a carman for Penn Central, and he later worked as a carman and car inspector at the railyard in Rochester, New York. R.R. 615a.[1] In these capacities, he repaired freight cars, changed brake valves and wheel sets, and generally kept the cars in working order. *Id.* at 599-601a. This work required him frequently to kneel or squat next to or under rail cars and climb onto, up, down, over and under rail cars while lifting and using heavy vibrating tools. *Id.* at 988a-89a, 1000a, 1004a-05a, 1011a-12a, 1016a-19a, 1042a-43a, 1049a-50a, 1061a-65a. Appellee claimed that his many years of heavy work, combined with frequent awkward postures, caused gradual development of career-ending shoulder, knee and carpal tunnel injuries. N.T., 11/13/15, at 41-60 (Appellee's closing argument). Dr. Andres, Appellee's liability expert, testified that Appellee's job duties exposed his shoulders and knees to "high-force exertions," and that Appellants "could have minimized the effects of [Appellee's] exposure to these risk factors" but failed to do so. *Id.* at 373a-74a, 1360a-62a.

The jury found for Appellee and awarded him $600,000, which the trial court molded to $597,000 to reflect the jury's finding that Appellee was .5% comparatively negligent. The trial court denied Appellants' post-trial motions and entered judgment in favor of Appellee. Appellants filed a timely appeal, and Appellants and the trial court complied with Pa.R.A.P. 1925.

---

[1] Whenever possible, for the convenience of the parties, we cite to the reproduced record.

Appellants raise the following issues in this appeal:

1. Should the trial court have excluded [Appellee's] liability expert where [Appellee] failed to show that the expert's methodology is generally accepted in the field of ergonomics or reliable?

2. Are [Appellants] entitled to a new trial where [Appellee's] counsel repeatedly and intentionally violated the trial court's ruling on a motion *in limine* and made an inflammatory and highly prejudicial comment about the unrelated details of two railroad employees?

3. Did the trial court commit reversible error by admitting into evidence testimony about "thousands of claims" against [Appellants] by other employees, despite [Appellee's] failure to show that these claims were substantially similar to the facts in this case?

Appellants' Brief at 3.

In their first argument, Appellants object to the trial court's order denying their motion to exclude Dr. Andres' expert testimony. According to Appellants, Dr. Andres' methodology is not generally accepted in the field of ergonomics, and he failed to objectively measure the actual forces to which Appellee was exposed on the job. More specifically, Appellants argue that Dr. Andres failed to provide "objective ergonomic data that identifies [Appellee's] work tasks as being repetitive or exposing [Appellee] to awkward postures or forceful tasks" and failed to articulate steps that the railroads should have taken to minimize risk factors. *Id.* at 20, 26. We disagree.

"[T]he admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless

the trial court abuses its discretion." ***See Grady v. Frito-Lay, Inc.***, 839 A.2d 1038, 1046 (Pa. 2003).

The Rules of Evidence provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
> >
> > (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
> >
> > (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa.R.E. 702, which includes showing that the rule in ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923), is satisfied. ***See Grady***, 839 A.2d at 1045. ***Frye***, which is now embodied in Pa.R.E. 702(c), instructs that the court should not admit scientific evidence during trial unless the underlying methodology has gained general acceptance in the scientific community. ***See Commonwealth v. Topa***, 369 A.2d 1277, 1281-82 (Pa. 1977). "***Frye*** does not apply to every time science enters the courtroom . . . ***Frye*** does apply, however, where an expert witness employs a novel scientific methodology in reaching his or her conclusion." ***Folger ex rel. Folger v. Dugan***, 876 A.2d 1049, 1058 (Pa. Super. 2005) (*en banc*) (citations omitted). One method to assess a ***Frye***

motion is to conduct a *Frye* hearing, although a hearing is not mandatory. *See id.* ("[t]he trial court did not err in declining to conduct a *Frye* hearing").

Dr. Andres, a bioengineer and ergonomist[2] for thirty-five years, has published hundreds of publications, abstracts, technical reports and trade notes on ergonomics in peer-reviewed publications and has received multiple grants to perform ergonomic research from organizations such as NASA, OSHA and the National Institute of Occupational Safety and Health. R.R. 382a-87a, 392a-93a. He has performed twenty-four site inspections of carmen's workplaces, ten of which were CSX workplaces. *Id.* at 281a, 382a-87a, 1304a. Dr. Andres interviewed Appellee, reviewed his medical records, and read his deposition detailing his work as a carman. *Id.* at 281a-82a, 1328a-29a, 1360a. Additionally, Dr. Andres reviewed the analysis of numerous railroad industry consultants concerning the frequency of carmen's tasks, the forces created by performing these tasks, the

---

[2] "Ergonomics is the science of fitting workplace conditions and job demands to the capabilities of the working population." *Ahmed v. Keystone Shipping Co.*, 2012 WL 5300094, at *5 (E.D. Mich. 2012) (citing Occupational Safety and Health Administration's definition of ergonomics). Federal courts have held that "ergonomics is an accepted scientific field," *Hewitt v. Metro-North Commuter Railroad*, 244 F. Supp. 3d 379, 390 (S.D.N.Y. 2017), and this Court has implicitly signified its agreement. *See Zito v. Merit Outlet Stores*, 647 A.2d 573, 574, 576 (Pa. Super. 1994) (reversing nonsuit in slip-and-fall action against store based in part on ergonomic expert's testimony that ramp was too steep). We need not formally decide this question here. Appellants appear to accept that ergonomics is a generally accepted scientific field; they only dispute whether Dr. Andres' methodology is generally accepted in the field of ergonomics.

duration of these tasks and the risk factors for musculoskeletal disorders created by these tasks. *Id.* at 304a-08a. Based on this data, Dr. Andres performed a Three Dimensional Static Strength Prediction Program ("3DSSPP") biomechanical modeling of some of Appellee's tasks, *Id.* at 348a-55a, and concluded that these tasks violated the "strength criterion" for Appellee's shoulder and knee. *Id.* at 1354a-55a.

The trial court concluded that no need existed to hold a *Frye* hearing, because Dr. Andres' opinion

> was not based on a novel methodology. . . . Dr. Andres' testimony and expert report were based upon his education, biometric and ergonomics programs based on publications from NASA, the National Institute of Occupational Safety and Health, the Occupational Safety and Health Administration, and the Federal Railroad Administration. Additionally, Dr. Andres performed twenty-four site inspections of railroad carmens' workplaces and visited the Rochester Yard in preparation for another FELA case . . .

> The [c]ourt properly denied Appellants' motion to preclude Dr. Andres' testimony as it was for the jury to decide the weight to be given to Dr. Andres' testimony after hearing his qualifications and the facts, data and conclusions upon which he based his opinions.

Trial Ct. Op., 7/27/16, at 6.

This ruling was well within the trial court's discretion. The court's analysis is consistent with decisions in other FELA cases finding that the methodology of Dr. Andres himself and other ergonomists is generally accepted in the ergonomic community. *See Hewitt*, 244 F. Supp. 3d at 391 (Dr. Andres "employs multiple methodologies that are generally

accepted in the field of ergonomics"); *Rowley v. Union Pacific Railroad Co.*, 2016 WL 6561296, *1-*2 (E.D. Wis. 2016) (ergonomic expert based opinion on interview with plaintiff, depositions of two of plaintiff's coworkers, safety videos from defendant railroad, various scientific literature, and expert's own experience, education, and training; expert's opinion that exposure to recognized ergonomic risk factors—including awkward postures, forceful exertions, repetitive motions, contact stresses, and cold temperatures—can cause musculoskeletal disorders is "generally accepted within the ergonomic and scientific communities"); *Powers v. Union Pacific R. Co.*, 2009 WL 734707, *2 (E.D. Tex. 2009) (Dr. Andres testified and based opinion on "litigation files, [plaintiff's] work history, medical diagnoses and treatments," "job analysis summaries," "scientific literature and industry materials," and his "28 years of experience and practice in the field of ergonomics and over a decade of experience studying the railroad industry"; court found this data "both sufficient as well as of the type reasonably relied upon by experts in the field of ergonomics").[3]

---

[3] Although federal courts scrutinize expert testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), instead of *Frye*, there is some overlap between these tests. *Frye*, as stated above, asks whether the underlying methodology has gained general acceptance in the scientific community. Under *Daubert*, one of many criteria is whether the expert's methodology is generally accepted within the expert's field (although, unlike *Frye*, this criterion is not necessarily dispositive). *See Hewitt*, 244 F. Supp. 3d at 391; *Rowley*, 2016 WL 6561296, at *1-*2; *Powers*, 2009 WL 734707, at *2. Accordingly, these federal decisions provide persuasive authority for our analysis to the extent that they address whether

Appellants argue that Dr. Andres' testimony is deficient because he never assessed a carman's job at the yard where Appellee worked. Appellants' Brief at 20. In **Hewitt**, the district court held that it was unnecessary for Dr. Andres to visit the plaintiff's jobsite before rendering his opinion:

> Metro–North objects that Dr. Andres' opinions are inadmissible because he never personally observed any Metro–North employees performing the job tasks that allegedly led to Hewitt's injuries . . . Similarly, Metro–North criticizes Dr. Andres for relying upon videotapes of employees working at other railroad companies, rather than observing employees at Metro–North itself . . . The company also criticizes Dr. Andres for failing to observe Hewitt perform any of the allegedly dangerous job tasks . . . .
>
> For two reasons, the [c]ourt finds this alleged shortcoming insufficient to warrant exclusion of Dr. Andres' testimony. First, the evidence before the Court suggests that the science of ergonomics is sufficiently well-established so as to justify admitting expert testimony on the topic, even when the expert has not personally observed the allegedly unsafe job environment. As other district courts have recognized, it is well-established that "exposure to recognized ergonomic risk factors—including awkward postures, forceful exertions, repetitive motions, contact stresses, and cold temperatures—can cause" certain types of injuries and that these types of risk factors are especially prevalent in certain workplace settings, such as railroads. **Rowley**, 2016 WL 6561296, at *2; **see also Powers**, 2009 WL 734707, at *4 ("That ergonomic risk factors exist in a certain occupations and that known remedial measures alleviate such risks has been widely

ergonomists' methodology is generally accepted in the scientific community. **See Okeke-Henry v. Southwest Airlines, Co.**, 163 A.3d 1014, 1017 n.4 (Pa. Super. 2017) (decisions of lower federal courts may have persuasive, but not binding, authority on Superior Court).

described and accepted in the scientific community. That corrective actions can address ergonomic risk factors has been commonly accepted in the scientific community for several decades."); ***Ahmed [v. Keystone Shipping Co.]***, 2012 WL 5300094, at *6 [(E.D. Mich. 2012)] (noting that the defendants did not "question the basic science of ergonomics"). Additionally, the Second Circuit has recognized that "in many cases," the requirements of Federal Rule of Evidence [703][4] can be met simply through the "personal knowledge and experience of the expert." ***United States v. Litvak***, 808 F.3d 160, 181 n.25 (2d Cir. 2015) (citation omitted). Given these two considerations—the profusion of scientific literature on ergonomics and Dr. Andres' general familiarity with the science—the [c]ourt concludes that Dr. Andres could permissibly rely upon materials other than personal observations of Hewitt to form his opinions about the ergonomic risk factors present in Hewitt's particular workplace. The [c]ourt notes that other district courts have ruled similarly. ***See***, ***e.g.***, ***Rowley***, 2016 WL 6561296, at *3 (rejecting argument that an ergonomics expert's opinions were "unreliable because he failed to . . . conduct an on-site investigation"); ***Wright***, 2016 WL 1183135, at *6–7 (rejecting argument that ergonomics expert opinion should be excluded because the expert "did not personally assess plaintiff's work environment"); ***Ahmed***, 2012 WL 5300094, at *6 (rejecting argument that Dr. Andres' testimony should be excluded because he had "only seen photographs of the stairway and area where Plaintiff fell and admittedly has never visited the ship"); ***Smith v. BNSF Ry. Co.***, [] 2011 WL 4054858, at *4 (W.D. Okla. [] 2011) (rejecting argument that ergonomics expert's testimony should be excluded because the expert "never observed Plaintiff perform his job duties,

---

[4] ***Hewitt*** cites Federal Rule of Evidence 704. Read in context, it seems clear that the court intended to cite Federal Rule of Evidence 703. ***See*** F.R.E. 703 (providing in relevant part that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted"). Pennsylvania Rule of Evidence 703 is identical to this passage.

nor did he observe any other railroad employee who held similar duties to those performed by Plaintiff") . . . .

Second, the [c]ourt rejects Metro–North's argument as inconsistent with the reality of FELA cases. Metro–North's arguments suggest that ergonomics expert testimony can be admitted only if the expert personally observed the plaintiff performing his job. But, as one district court noted, it may be "impossible for [an ergonomics expert] to observe plaintiff perform his job duties" because the plaintiff's injuries likely prevent him from continuing to work for the defendant railway. *Wright*, 2016 WL 1183135, at *7; *see also Rowley*, 2016 WL 6561296, at *3 (rejecting argument that it was necessary for an ergonomics expert to personally observe the plaintiff at work, especially when the plaintiff "ha[d] not worked for [the defendant] in years," meaning that "it would be impossible to directly observe him at work now"). The implication of Metro–North's arguments is that virtually all ergonomics expert testimony should be inadmissible, a result the Court rejects given the general acceptance of ergonomics in the scientific community and the numerous district courts that have admitted this evidence.

*Hewitt*, 244 F. Supp. 3d at 388-90. We find *Hewitt's* thorough analysis persuasive and hold that Dr. Andres' testimony was admissible. *Hewitt* observed that under the Federal Rules of Evidence, it is possible for an expert to base his opinion on "personal knowledge and experience" instead of on-site visits. *Id.* at 389. The same holds true under Pa.R.E. 703, which, as noted above, is identical to the pertinent federal rules. Dr. Andres was permitted to base his opinion on personal knowledge and experience, given his impressive credentials and the wealth of scholarly literature on ergonomics, much of which is his own. While defense counsel could (and did) argue that Dr. Andres' failure to visit the yard where Appellee worked or

to observe Appellee performing his job undermined the weight of his testimony, these matters did not affect its admissibility. *See K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1098 (Pa. Super. 2015), *appeal denied*, 135 A.3d 586 (Pa. 2016) (if witness has any reasonable pretension to specialized knowledge on subject under investigation, he may testify as expert, and jury decides weight to give to his testimony).

Appellants also maintain that Dr. Andres never took any objective measurements of the degree of force to which Appellee was subject. Appellants' Brief at 20. We disagree. To calculate levels of stress caused by workplace tasks, Dr. Andres utilized a 3DSSPP program that "was developed at the University of Michigan Center for Ergonomics . . . based on 24 years of research at [this institution]. It calculates many stresses and forces, including the stress on the low back and on the major joints of the body." R.R. 346a (Dr. Andres' expert report). During trial, Dr. Andres described this program as "computer models [with which], based on measurement of the amount of force being exerted by the hands, we can predict the stresses on the joints in the body." *Id.* at 1350a. "[C]ompanies buy this tool," Dr. Andres continued, "and use [it] to analyze jobs. And what it does, based on a person's height and weight, i[s] calculate[] the forces at all joints and the forces in the low back." *Id.* Applying the 3DSSPP program to the job duties described by Appellee, *Id.* at 348a-55a, 1350a-55a, Dr. Andres concluded that Appellee's knees and shoulders were "exposed . . . to recognized

ergonomic risk factors . . ." *Id.* at 1357a. Nothing in Appellee's brief convinces us that the 3DSSPP program, or the manner in which Dr. Andres used this program, was not generally accepted in the ergonomic community.[5]

Finally, Appellants point out that two courts, including the Commonwealth Court, have found Dr. Andres' methodology deficient. Appellants' Brief at 23-25 (citing, *inter alia*, *Davies v. SEPTA*, — A.2d —, 2009 WL 9101442 (Pa. Cmwlth. 2009) (unpublished memorandum); *Pretter v. Metro North Commuter R. Co.*, 206 F. Supp. 2d 601 (S.D.N.Y. 2002)). *Davies* reasoned that Dr. Andres "offered no testimony to show that other ergonomists generally accept his methods" and failed to reference any "studies showing a correlation between the work of railroad engineers and [plaintiff's injuries]." *Id.* at 9101442, *5. We are not bound by precedential decisions of the Commonwealth Court, *see Murphy v. Karnek*, 160 A.3d 850, 860 n.11 (Pa. Super. 2017) (citation omitted), let alone non-precedential opinions such as *Davies*. Neither are we bound by decisions of federal district courts such as the *Pretter* court. *See Okeke-Henry*, 163 A.3d at 1017 n.4. In any event, for the reasons provided above, we

---

[5] In a similar vein, Appellants argue that Dr. Andres failed to cite "a single epidemiological study" that established a causal nexus between occupational disorders and musculoskeletal disorders. Appellants' Brief at 26. Once again, this argument goes to the weight of Dr. Andres' testimony, not its admissibility. *See K.H.*, 122 A.3d at 1098.

disagree with *Davies'* and *Pretter's* holdings that Dr. Andres' methodology is not generally accepted in the ergonomic community.

In their second argument, Appellants seek a new trial due to the prejudicial conduct of Appellee's counsel during trial. We hold that counsel's repeated violations of the trial court's order granting Appellants' motion *in limine*, as well as counsel's inflammatory remark concerning the death of two CSX carmen in an unrelated case, warrant a new trial.

Prior to trial, Appellants filed a motion *in limine* to preclude Appellee from introducing evidence or argument at trial concerning his allegation that Appellants provided inadequate manpower or that the lack of manpower caused Appellee's injuries. The court granted Appellants' motion on the ground that Appellee failed to provide any support for this allegation.

Nevertheless, counsel for Appellee repeatedly delved into the subject of manpower during trial. During Appellee's testimony, counsel asked "how many carmen were assigned to work at Rochester Yard," R.R. 978a, and asked multiple times whether Appellee worked with a partner or had to move heavy equipment by himself. *Id.* at 1157a, 1164a-65a, 1167a, 1242a. On redirect, counsel asked Appellee if he knew "of any other way the work can be done other than the way [he] did it at the railroad." *Id.* at 1732a. Counsel then asked Appellee whether "handling rerailers is a two-man job," whether there were times Appellee had to handle a rerailer by himself, and approximately when that occurred. *Id.* at 1735a-36a.

- 14 -

In addition while cross-examining Dr. Tucker, Appellants' expert in the field of orthopedic surgery, counsel asked whether Dr. Tucker agreed "that there should be either a lifting device or a second person to help out lift that retailer if and when that time comes." *Id.* at 1534a. Counsel also read a passage from Dr. Tucker's report that stated: "[Appellee] does appear to claim at times the railroad did not provide him with the help or manpower." *Id.* at 1545a. Further, counsel asked Dennis Broadbent, CSX's director of quality control, about the number of persons who worked at the Buffalo yard and stated that there were "six carmen at [the Rochester] yard." *Id.* at 1829a, 1844a. Counsel also asked Broadbent whether it was "not appropriate for one guy to carry" a rerailer and whether "the safest way to carry rerailers with two persons as opposed to three." *Id.* at 1891a.

Counsel for Appellants objected to each of these questions. The trial court sustained most of Appellants' objections but declined to grant a mistrial. Appellants also preserved their objection to "manpower" questions in their post-trial motions. Appellants' Post-Trial Motions, at 65-66.

The purpose of pretrial motions *in limine* is to "give[] the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury." *See Parr v. Ford Motor Co.*, 109 A.3d 682, 690 (Pa. Super. 2014) (*en banc*) (citation omitted). A trial court's decision to grant or deny a motion *in*

*limine* "is subject to an evidentiary abuse of discretion standard of review."

***Id.*** (citation and question marks omitted).

"[W]hen a party intentionally violates a pre-trial order, the only remedy is a new trial, in order to promote fundamental fairness, to ensure professional respect for the rulings of the trial court, to guarantee the orderly administration of justice, and to preserve the sanctity of the rule of law." ***Mirabel v. Morales***, 57 A.3d 144, 151 (Pa. Super. 2012) (quotation marks omitted) (new trial warranted where counsel for plaintiff disregarded pretrial order to refrain from discussing Comcast's size and wealth during closing argument in attempt to highlight economic disparities between the parties); ***Poust v. Hylton***, 940 A.2d 380, 387 (Pa. Super. 2007) (new trial required in wrongful death action, where court entered order precluding defense counsel from mentioning decedent's cocaine use, but defense counsel asked decedent's treating physician whether decedent had cocaine in his system at time of death).  The ***Poust*** court aptly reasoned:

> The grant of a motion *in limine* is a court order that must be observed.  To allow [defense] counsel to violate such a court order, without the declaration of a mistrial, as was immediately sought by [plaintiff's] counsel here, would defeat the intended purpose of such orders.  Why would counsel ever bother filing such a motion if opposing counsel were free to blithely ignore it without the court's affording any relief to the offended party by way of the grant of a mistrial upon proper application?

***Id.*** at 385.

- 16 -

Appellee does not contest that his counsel's references to "manpower" violated the trial court's pretrial order. Instead, Appellee contends that they caused no prejudice. We disagree. In the first place, Appellee did not proffer any expert testimony that the railroads provided insufficient manpower, so Appellee had no foundation to claim insufficient manpower. By repeatedly injecting the manpower issue into the case, counsel drew attention to a theory that the jury never should have heard and invited the jury to decide the case on an improper basis. Although the trial court issued several curative instructions to disregard counsel's improper remarks, the sheer number of counsel's improper references prejudiced Appellants; they were "too numerous to be harmless." *Pioneer Commercial Funding Corp. v. American Fin. Mortg. Corp.*, 797 A.2d 269, 291 (Pa. Super. 2002), *rev'd on other grounds*, 855 A.2d 818 (Pa. 2004) (new trial on punitive damages granted where plaintiff's counsel made multiple inflammatory remarks during closing argument); *see also Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 987 (Pa. Super. 2005) (plaintiff's counsel's repeated interjections of evidence of foreign crash test standards, which trial court had precluded in pretrial order, was reversible error requiring new trial); *Nigra v. Walsh*, 797 A.2d 353, 358 (Pa. Super. 2002) (new trial warranted in personal injury action where defense counsel violated collateral source rule with multiple questions or comments whose "cumulative effect" was to suggest that plaintiff was receiving social security

disability benefits for injuries for which plaintiff sought damages in personal injury action).

Another instance of misconduct by Appellee's counsel provides a separate and independent reason for granting a new trial. The following exchange took place during Broadbent's cross-examination:

> [Counsel for Appellee]: In 2007, CSX made you director of quality, or something like that?
>
> [Broadbent]: Director of quality control in Jacksonville.
>
> [Counsel for Appellee]: Was that after two carmen were killed?

*Id.* at 1845a. Appellants objected and moved for a mistrial. The trial court sustained the objection, calling counsel's conduct "a shameless attempt to prejudice this jury," but did not grant a mistrial. R.R. 1846a. Counsel for Appellants requested a curative instruction. *Id.* The trial court stated that it would tell the jury to disregard the question but then failed to issue the instruction; the court simply asked counsel for Appellee to "restate [his] question." R.R. 1847a.

We review the trial court's denial of a motion for mistrial for abuse of discretion. *See Poust*, 940 A.2d at 385. The law is clear that attorneys may not make "irrelevant remarks . . . which are reasonably likely to have a direct and prejudicial effect on the award of damages." *Narciso v. Mauch Chunk Tp.*, 87 A.2d 233, 234, 235 (Pa. 1952) (new trial required due to defense counsel's single remark during closing argument that civil action

- 18 -

was "in reality against the taxpayers of the township and not against the township itself"). In **Poust**, a wrongful death action, the trial court entered a pretrial order precluding the defendant from mentioning the word "cocaine" during trial with reference to the decedent. Defense counsel ignored this order by asking the decedent's treating physician whether the decedent had cocaine in his system. The trial court denied the plaintiff's motion for mistrial and declined to give a curative instruction. Following a defense verdict, this Court reversed and remanded for a new trial, stating:

> The trial court clearly abused its discretion in failing to grant the requested relief of a mistrial, which should have been granted to [plaintiff] immediately at the time that the court order was violated by defense counsel. In her violation of this pre-trial order of the court, [defense] counsel clearly uttered the word "cocaine", which [plaintiff] had sought to preclude due to the potentially prejudicial effect of the mention of that word in front of the jury. Under Pennsylvania law, [plaintiff] was entitled to the declaration of a mistrial, *ipso facto*, immediately upon [defense] counsel's flagrant and intentional use of this obviously prejudicial word "cocaine", in violation of the prior pre-trial preclusion order of the trial court.

**Poust**, 940 A.2d at 385.

As in **Poust**, the trial court herein abused its discretion by failing to grant a mistrial in response to the irrelevant and prejudicial remark of counsel for Appellee about the death of two CSX carmen in an unrelated case. And as in **Poust**, the trial court compounded its error by failing to issue a curative instruction to the jury.

In their final argument, Appellants contend that the trial court erred by denying their motion *in limine* to preclude evidence that Appellants "received thousands of claims for carpal tunnel syndrome and lower extremity disorders and upper extremity disorders as well." R.R. 1331a-32a. Appellants argue that this "other claims" evidence was inadmissible because Appellee failed to demonstrate that these claims were substantially similar to his own, and because its prejudicial impact outweighed its probative value.

The trial court denied Appellants' motion *in limine* without conducting a hearing. R.R. 906a. Since we are remanding on other grounds articulated above, the trial court should take the opportunity on remand to hold an evidentiary hearing on this issue.

In a variety of cases, we have directed trial courts to hold hearings on remand to develop issues that affect the disposition of the case. *See*, *e.g.*, *Moscatiello v. Pittsburgh Contractors Equip. Co.*, 595 A.2d 1198, 1205 (Pa. Super. 1991) (remanding for ascertainment of additional facts concerning timing and extent of damages to machine sold by defendant to determine whether defendant was entitled to setoff against damages awarded to plaintiff); *see generally* Standard Pa. Practice, § 92:110 (collecting cases). Here, good reason exists to convene an evidentiary hearing on the "other claims" issue. "Other claims" evidence is admissible when the plaintiff demonstrates "substantial similarity" between these claims and his own injuries. *See*, *e.g.*, *Lockley v. CSX Transp., Inc.*, 5 A.3d 383,

395-96 (Pa. Super. 2010). The present record leaves us uncertain whether Appellee has met this burden. At one point, Dr. Andres indicated that Appellants received thousands of claims from other railroad employees that were substantially similar to Appellee's claims. R.R. 1331a-32a (Dr. Andres answered "yes" to counsel's question about whether Appellants "received thousands of claims for carpal tunnel syndrome and lower extremity disorders and upper extremity disorders as well"). Moments later, however, he appeared to testify that the other claims submitted to Appellants did not pertain to carmen such as Appellee. R.R. 1333a-34a. To resolve this apparent inconsistency, and to alleviate further confusion during the next trial, we instruct the trial court to hold an evidentiary hearing on the "other claims" issue prior to retrial.

Judgment reversed. Case remanded for further proceedings in accordance with this opinion. Jurisdiction relinquished.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

*Date: 11/16/2017*