J-A09030-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| FRED L. AND ELLEN W. SHULTZ | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| YORK HOSPITAL, WELLSPAN | : | No. 984 MDA 2022 |
| MEDICAL GROUP, T/D/B/A | : | |
| WELLSPAN HOSPITALISTS | : | |

Appeal from the Judgment Entered August 17, 2022
In the Court of Common Pleas of York County Civil Division at No(s):
2016-SU-001288-82

BEFORE:  PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:　　　　　　**FILED: APRIL 16, 2024**

Appellants, Fred L. and Ellen W. Shultz (husband and wife), filed an action alleging corporate negligence against York Hospital, together with claims for vicarious liability against York Hospital and Wellspan Medical Group, t/d/b/a Wellspan Hospitalists ("Wellspan Hospitalists") (collectively, the "Appellees") after Fred L. Shultz ("Shultz") suffered a stroke in September 2014.  At the close of Appellants' case-in-chief, the trial court granted Appellees' motion for a compulsory non-suit.  After the court denied Appellants' request to remove the non-suit, Appellants appealed following the entry of an adverse judgment.  We affirm, in part, reverse, in part, and remand for a new trial.

The trial court summarized the relevant facts of this case as follows.

> [Shultz], then 65[ years-old], was admitted to York Hospital on September 25, 2014[,] after waking up early in the morning

with a feeling of numbness and weakness in his left side. The day before his admission, Shultz underwent an operation on his right leg for varicose veins. [At] the time Shultz arrived at York Hospital[,] it was unknown whether he was still within the time [period during which an effective dose of tissue plasminogen activator[1] could be administered;] thus, it was not administered to him. Dr. Craig Goldstein attended to Shultz while at York Hospital. Dr. Goldstein identified trace right leg edema in addition to the obvious stroke [Shultz suffered].

Dr. Goldstein formulated a treatment plan for Shultz, which included [the administration of] a transthoracic echocardiogram to determine whether Shultz['s] heart contained a patent foramen ovale [("PFO")[2]]. Dr. Goldstein's treatment plan did not include either a transesophageal echocardiogram or a right leg ultrasound to confirm or rule out the presence of a deep vein thrombosis [("DVT")] in Shultz'[s] leg at the area of the varicose vein surgery. After the transthoracic echocardiogram, further testing was recommended on an outpatient basis as [] some abnormalities [] were noted. York Hospital's physicians and nursing staff performed additional tests to confirm it was safe to discharge Shultz, and he was in fact discharged on September 26, 2014.

Notably, prior to [Shultz's] discharge on September 26, 2014[, a] York Hospital nurse[,] Kimberly Pope[,] identified research connecting varicose vein surgery in the presence of a [PFO] with subsequent stroke. Even with this connection, [] Pope noted [that,] even if further testing confirmed the presence of a [PFO], this discovery "would not change [the hospital's] management at this point." Another York Hospital doctor, Dr. Kathy McGill, relied upon [] Pope's statement in not ordering a transesophageal echocardiogram before Shultz['s] discharge.

---

[1] Introduced to the body through intravenous means, tissue plasminogen activator is a medical treatment that dissolves blood clots that block blood flow to the brain. HTTS://www.ninds.nih.gov (last visited 8/8/23).

[2] A patent foramen ovale or PFO is a small opening between the two upper chambers of the heart, the right and left atrium. A PFO can allow blood clots to travel from the right atrium to the left atrium and out to blood vessels of the body. HTTS://www.hopkinsmedicine.org (last visited 8/14/23).

Shultz returned to York Hospital on September 27, 2014 at 11:55 p.m. with stroke symptoms. This second stroke was described as "a large territory right middle cerebral artery infarction." While hospitalized for this stroke, Shultz underwent a transesophageal echocardiogram on September 29, 2014. The next day, September 30, [2014,] Shultz underwent a right calf endovenous ultrasound which confirmed the presence of [DVT] at the site of Shultz['s] varicose vein surgery. Almost immediately upon confirmation of both the [PFO] and [DVT], Shultz was started on an anticoagulant, specifically[,] [C]oumadin.

Trial Court Opinion, 8/12/22, at 1-3 (footnotes added).

On May 11, 2016, Appellants filed a complaint against Appellees, which they amended on June 22, 2016. In their amended complaint, Appellants set forth a claim of corporate negligence against York Hospital. In addition, Appellants set forth claims alleging vicarious liability against Wellspan Hospitalists and York Hospital. In support of their vicarious liability claims, Appellants averred that physicians, nurses, and other hospital personnel, acting as Wellspan Hospitalists' agents and as York Hospital's ostensible agents, failed to provide reasonable care under the circumstances and that this failure caused Shultz's subsequent stroke.

On May 28, 2021, Appellants moved for summary judgment, arguing that, pursuant to **Thompson v. Nason Hospital**, 591 A.2d 703 (Pa. 1991), York Hospital owed a duty to "ensure [Shultz's] safety and well[-]being" while admitted as a patient in the hospital. Appellants' Brief in Support of Motion for Summary Judgment, 5/28/21, at 30. Appellants claimed that York Hospital breached this duty by discharging Shultz without proper medications and without conducting all appropriate tests to accurately assess his medical

condition after his first stroke. *Id.* at 37-41. Appellants also alleged that these failures caused Shultz's second stroke. *Id.* at 37-41. Within their motion, Appellants alleged that no disputed material facts existed, and they were entitled to judgment as a matter of law with respect to their corporate negligence claim against York Hospital and their vicarious liability claims against Appellees, collectively. *Id.* at 47-48.

On June 1, 2021, Appellees moved for partial summary judgment, asserting that Appellants' claims of corporate negligence against York Hospital were subject to summary dismissal. In particular, Appellees argued that Appellants misrepresented and incorrectly sought to expand the standard of care set forth in *Thompson* by claiming York Hospital owed a duty to "'ensure the safety and well[-]being' of its patients" through development and enforcement of procedures intended to ensure "point of care" supervision. Appellees' Brief in Support of Partial Summary Judgment, 6/1/21, at 9 (citations omitted). Appellees also claimed that, in a recent case, this Court "explained [that] the doctrine of corporate negligence [did] not require a hospital to direct or override its providers' clinical judgment." *Id.* at 10, *citing* *Ruff v. York Hospital*, 257 A.3d 43 (Pa. Super. 2021). Accordingly, Appellees argued they were entitled to an order granting partial summary judgment and dismissing Appellants' corporate negligence claim against York Hospital. On September 10, 2021, the trial court denied both sides' requests for summary judgment, concluding that genuine issues of fact remained, and

summary judgment was therefore inappropriate. Trial Court Opinion, 9/10/21, at *7 (unpaginated).

On April 6, 2022, Appellees filed an omnibus motion *in limine*, seeking, *inter alia*, to preclude Appellants' expert, Kevin Brady, M.D., from "reading [] or citing [to] the Patient Safety Advisory of 2010" (hereinafter, the "Advisory") during his testimony.[3] Appellees' Omnibus Motion *in Limine*, 4/6/22, at 8-9, ¶¶ 31-33. Appellees argued that this Court in **Ruff** ostensibly treated the Advisory as a learned treatise, which is inadmissible under the Pennsylvania Rules of Evidence. As such, Appellees maintained that the trial court was required to prohibit Dr. Brady from making extensive references to the Advisory during his expert testimony. **See** Appellees' Memorandum of Law in Support of Omnibus Motions *in Limine*, 4/13/22, at 10; **see also Ruff**, 257 A.3d at 59.

On April 13, 2022, Appellants filed their own motions *in limine*. Appellants' Consolidated Pre-Trial Motions, 4/13/22, 1-3. The trial court issued an omnibus order of court on May 11, 2022, which, in relevant part, denied most of Appellants' motions *in limine* and generally granted Appellees' motions. Trial Court's Omnibus Order, 5/11/22, at 1-7. Importantly, the trial court granted Appellees' motion seeking to limit Dr. Brady's expert testimony insofar as it concerned the Advisory. In particular, the trial court allowed Dr.

_____

[3] We describe Dr. Brady's role as Appellants' expert, as well as the nature and substance of the Advisory, in greater detail below.

Brady to "make reference to the Advisory," but prohibited him from "read[ing it at length." *Id.* at 4.

On June 13, 2022, the matter proceeded to a jury trial. During trial, the court dismissed Appellants' expert, Dr. Brady, as a witness because he "read directly from the Advisory in direct violation of the [trial court's May 11, 2022 omnibus order]." Trial Court Opinion, 8/12/22, at 8. At the conclusion of Appellants' case-in-chief, Appellees moved for compulsory non-suit. Appellees argued that, without Dr. Brady's expert testimony, Appellants could not sustain a claim of corporate negligence against York Hospital. Appellees' Motion for Non-suit, 6/17/22, at 2-3. Moreover, Appellees claimed Appellants' other experts, Irfan Altafullah, M.D. and Brian T. Larkin, M.D., presented "irrevocably conflicting testimony on a number of points critical to [Appellants'] *prima facie* case" concerning the negligence of the clinical care providers, rendering non-suit appropriate as to Appellants' vicarious liability claims against Appellees. *Id.* at 9, ¶ 29. Ultimately, the trial court granted Appellees' motion. Trial Court Order, 6/17/22, at 1. Appellants filed a motion for post-trial relief on June 23, 2022, asking the trial court to remove the non-suit. The trial court denied Appellants' motion on July 5, 2022. Trial Court Order, 7/5/22, at 1. Appellants brought this appeal following the entry of an adverse final judgment.[4]

_____

[4] Originally, Appellants filed a notice of appeal from the July 5, 2022 order that denied their post-trial motion for relief. Because no final, appealable
*(Footnote Continued Next Page)*

Appellants raise the following issues on appeal:[5]

1. Did the trial court err in failing to grant [Appellants'] motion for summary judgment, as a matter of law?

2. Did the trial court abuse its discretion by granting [Appellees'] pre-trial motion[s] *in limine* and refusing [Appellants'] motions *in limine*?

3. Did the trial court, under the facts of this case, err by ruling that[,] under the corporate negligence theory of liability outlined in [**Thompson**], York Hospital:

   a) Had no standard of care (conduct) duty to ensure the safety and well-being of [Shultz];

   b) Had no legal duty to act for the protection of [Shultz] from a discharge from the hospital without a diagnosis of the cause of his first stroke and the proper medication needed to prevent his second disabling stroke?

4. Did the trial court err and abuse its discretion in disqualifying [Dr. Brady] and prohibiting him from testifying about York Hospital's corporate negligence?

5. Did the trial court err in granting [Appellees'] motion for non[-]suit of [Appellants'] corporate liability claim[?]

_____

judgment appeared on the trial court's docket, this Court issued an order on August 16, 2022, directing Appellants to praecipe the trial court prothonotary to enter an adverse judgment. ***See International Ass'n of Theatrical Stage Employees, Local Union No. 3 v. Mid-Atlantic Promotions, Inc.***, 856 A.2d 102 (Pa. Super. 2004) (reiterating that denial of post-trial motion to remove non-suit is interlocutory and generally not immediately appealable; it is the subsequent entry of judgment that is appealable). Appellants filed a certified copy of the trial court docket on August 16, 2022 showing that judgment was properly entered on the non-suit on August 17, 2022. Based upon the foregoing, we deem Appellants' appeal timely filed. ***See*** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").

[5] We have reordered Appellants' issues for ease of discussion and disposition.

6. Did the trial court err in granting [Appellees'] motion for non[-]suit of [Appellants'] vicarious liability claim[?]

Appellants' Brief at 8-9 (superfluous capitalization omitted).

In their first three appellate issues, Appellants challenge the trial court's denial of their motion for summary judgment, as well as the trial court's disposition of the parties' opposing motions *in limine*. In large part, Appellants' claims center upon the trial court's interpretation and application of the doctrine of corporate negligence as outlined in **Thompson**, wherein our Supreme Court delineated the duties of care owed by a hospital organization. **See** Appellants' Brief at 37-47, 66-68, and 71. In particular, Appellants argue that the trial court erred in holding that **Thompson** did not impose a general duty to ensure Shultz's "safety and well-being" while he was a patient at York Hospital. **Id.** at 46. In addition, Appellants claim that the trial court erred in declining to engage in a pre-trial analysis, either in the context of summary judgment litigation or other pre-trial stages, to consider whether, pursuant to Section 328B of the Restatement (Second) of Torts[6] or **Althaus v. Cohen**,

_____

[6] Section 328B of the Restatement (Second) of Torts outlines the functions of the trial court in an action for negligence. It states that, in an action for negligence, a trial court determines the following:

> (a) whether the evidence as to the facts makes an issue upon which the jury may reasonably find the existence or non-existence of such facts;
> (b) whether such facts give rise to any legal duty on the part of the defendant;
> (c) the standard of conduct required of the defendant by his legal duty;

*(Footnote Continued Next Page)*

- 8 -

756 A.2d 1166 (Pa. 2000),[7] York Hospital owed "Shultz an affirmative duty to protect him from the foreseeable risk of a second stroke." Appellants' Brief at 67; *see also* Appellant's Brief at 41-47 and 71. These issues "present pure questions of law," and, as such, "our standard of review is *de novo* and our scope of review is plenary." *In re Vencil*, 152 A.3d 235, 241 (Pa. 2017).

Inasmuch as Appellants' initial claims focus upon *Thompson*, we begin our analysis with an overview of that case and then turn to the trial court's application of the corporate negligence doctrine to the pre-trial motions filed herein. In *Thompson,* our Supreme Court "first adopted the theory that a corporation, specifically a hospital, can be held directly liable for corporate negligence." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997). At the outset,

---

> (d) whether the defendant has conformed to that standard, in any case in which the jury may not reasonably come to a different conclusion;
> (e) the applicability of any rules of law determining whether the defendant's conduct is a legal cause of harm to the plaintiff; and
> (f) whether the harm claimed to be suffered by the plaintiff is legally compensable.

*Id*.

[7] In *Althaus*, *supra*, our Supreme Court explained that, in order to determine "whether a duty exists in a particular case," a court must weigh the following factors:

> (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Id.* at 1169.

- 9 -

the **Thompson** Court explained the doctrine of corporate negligence as follows:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

**Thompson**, 591 A.2d at 707. In defining the contours of this theory, the Supreme Court channeled a hospital's duties into the following "four general areas:"

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

**Id**. (citations omitted).

Having delineated, in **Thompson**, a hospital organization's corporate duties within the context of patient care and safety, the Supreme Court in **Welsh** explained that a plaintiff must plead and prove the following to present a *prima facie* case of corporate negligence:

> 1. [the hospital] acted in deviation from the standard of care;
>
> 2. [the hospital] had actual or constructive notice of the defects or procedures which created the harm; and
>
> 3. [] the conduct was a substantial factor in bringing about the harm.

- 10 -

***Whittington v. Episcopal Hosp.***, 768 A.2d 1144, 1149 (Pa. Super. 2001), *citing* **Welsh**, 698 A.2d at 585. In addition, the Court stated that, "unless the hospital's negligence is obvious, an expert witness is required to establish two of the three prongs: that the hospital deviated from the standard of care and that such deviation was a substantial factor in bringing about the harm." ***Whittington***, 768 A.2d at 1149, *citing* **Welsh**, 698 A.2d at 585.

Within the context of the parties' motions for summary judgment and their motions *in limine*, the trial court recognized that it was "called upon" to analyze the Supreme Court's decision in ***Thompson***, including the limits of the theory, about which "the[] parties [were] truly conflicted." Trial Court Opinion, 9/10/21, at *4. The trial court explained that ***Thompson*** initially stated that "the responsibility for a hospital under the theory of corporate negligence is described as, 'to ensure the patient's safety and well-being while at the hospital.'" **Id**. at *4, *quoting* ***Thompson***, 591 A.2d at 707. The trial court, however, recognized that ***Thompson*** refined the descriptive label of "patient safety and well-being" by limiting a hospital's responsibility to "four specified duties." Trial Court Opinion, 9/10/21, at *4. In conclusion, the trial court stated:

> this [c]ourt is confident in continuing to uphold ***Thompson***'s four duties as the primary expressions of access to relief under a corporate negligence case against a hospital. The requirement to ensure safety and well-being, while itself general, is certainly meaningfully restricted to the four duties laid out in ***Thompson***; those duties are not mere "areas" of example as to what the responsibility requires, but are specific duties and theories of negligence under which a party can plainly bring suit.

*Id.* at *6-*7 (unpaginated).

Upon review, we conclude that the trial court correctly interpreted and applied our Supreme Court's decision in **Thompson**. Indeed, the trial court recognized that, at the outset of the opinion, the **Thompson** Court, for the first time, held that a hospital had a responsibility to "ensure [a] patient's safety and well-being while at a hospital." **Thompson**, 591 A.2d at 707. The trial court, however, correctly observed that **Thompson** did not impose upon a hospital an overarching and general **duty** to ensure a patient's safety and well-being. Instead, the **Thompson** Court, in explaining the scope of a hospital's general responsibility, "**outlin[ed] the boundaries of the doctrine**" by imposing liability upon a hospital if it "fail[ed] to uphold any one of the . . . **four [expressly enumerated] duties**." **Whittington**, 768 A.2d at 1149 (emphasis added). Hence, the trial court astutely directed Appellants to channel their corporate negligence claims against York Hospital into one (or more) of the duties outlined in **Thompson**. This is consistent with subsequent case law interpreting **Thompson**. **See Welsh**, 698 A.3d at 586 (Pa. 1997) (associating the appellant's claims of negligence with the second, third and fourth duties outlined in **Thompson**); **Ruff**, 257 A.3d at 49 ("Under a corporate negligence theory, four general, non-delegable duties are imposed on the hospital[.]"); **Sokolsky v. Eidelman**, 93 A.3d 858, 869 (Pa. Super. 2014) (explaining **Thompson** "'embraced' four established duties" hospitals owe to patients) (citation omitted); **Edwards v. Brandywine Hosp.**, 652 A.2d 1382, 1386 (Pa. Super. 1995) (explaining that the "enumerated duties

- 12 -

[in **Thompson**] . . . appear broad and somewhat nebulas" but a court must "discern their outlines"). Importantly, we note that the trial court's decision did not "destroy" Appellants ability to pursue an action for corporate negligence against York Hospital. Appellants' Brief at 46. In fact, the trial court expressly rejected Appellees' contention that Appellants' allegations, *i.e.*, that York Hospital was liable for failing to supervise the diagnostic process performed during Shultz's stay or adopt certain procedures to ensure such supervision, fell completely outside the scope of the duties outlined in **Thompson**. Instead, the trial court simply directed Appellants to avoid alleging that **Thompson** imposed a fifth, general duty. As stated above, the trial court was correct in this determination.

Moreover, we disagree with Appellants' contention that the trial court erred by declining to analyze Appellants' various claims and determine "whether [] York Hospital owed . . . Shultz an affirmative duty to protect him from the foreseeable risk of a second stroke" during the summary judgment or other pre-trial stages pursuant to Section 328 of the Restatement (Second) of Torts or **Althaus**, **supra**. Appellants' Brief at 66-67; **see also id.** at 41-47 and 71; Appellants' Brief in Support of Motion for Summary Judgment, 5/28/21, at 36-37; and Appellant's Brief in Support of Consolidated Pre-Trial Motions, 4/13/22, at 34-35. In asserting a need to undertake such an analysis, Appellants appear to rely upon **Scampone v. Highland Park Care Ctr. LLC**, 57 A.3d 582, 606 (Pa. 2012) (explaining that, in order to determine whether a nursing home owed a duty of care to its patient, the trial court must

- 13 -

apply "Section 323 of the Restatement [(describing in general terms the duty of one to aid another as to whom one has undertaken to provide services, gratuitously or for consideration)] or . . . the **Althaus** factors"); **see** Appellants' Brief at 75 (noting that, in **Scampone**, 57 A.3d at 606, our "Supreme Court explained when an inquiry does not capture the appropriate standard by which to decide whether a duty of care exists under **Thompson**[,] employing the incorrect test generally effects how evidentiary proffers are received and their relevant weight accorded to the relevant evidence").

Appellants, however, overlook our Supreme Court's determination that an **Althaus** analysis is unnecessary in situations involving the application or vindication of established duties (such as those established in **Thompson**) in novel contexts. Specifically, in **Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.**, 106 A.3d 27 (Pa. 2014), our Supreme Court stated:

> As to the aspects of this litigation centered on the **Althaus** factors, we find these to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario. Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application.

**Id.** at 40–41. Hence, as a hospital's duty to its patients was specifically articulated in **Thompson**, a full-scale public policy analysis under the Restatement (Second) of Torts or **Althaus** is superfluous in the present context. **See Scampone v. Grane Healthcare Company**, 169 A.3d 600,

- 14 -

617 (Pa. Super. 2017) ("Thus, **Alderwoods** indicates that if a common law duty exists under the Restatement (Second) of Torts, the **Althaus** analysis is not necessary."); **see also Shannon v. McNulty**, 718 A.2d 828, 836 (Pa. Super. 1998) ("The **Welsh** case involved a suit against a hospital and thus **Thompson** was clearly applicable"). Accordingly, the trial court correctly determined that, because **Thompson** specifically outlined York Hospital's four potential duties of care, any analysis pursuant to **Althaus** or the Restatement (Second) of Torts was utterly unnecessary.

We have concluded that the trial court correctly determined that **Thompson** did not impose a general duty of care and, instead, specifically outlined four distinct duties of care upon which a claim of corporate negligence may be grounded. For this reason, we also conclude that the trial court did not need to resort to an analysis pursuant to **Althaus** or the Restatement (Second) of Torts. Accordingly, to the extent Appellants attack the trial court's resolution of the parties' opposing pre-trial motions based upon an errant reading of **Thompson**, we conclude those claims are devoid of merit.[8] We

_____

[8] For similar reasons, we largely reject the contentions that Appellants raise in their third issue. In the initial subpart of this claim, Appellants allege that the trial court erred in concluding that, under **Thompson**, York Hospital owed no duty to ensure Shultz's safety and well-being. **See supra** at 7. This claim runs counter to a proper reading of **Thompson**, as the trial court correctly determined and as we have discussed above. In the second subpart of their third issue, Appellants contend that York Hospital owed two distinct "duties." First, Appellants claim that the hospital owed a duty to protect Shultz from a discharge without a diagnosis of the cause of his first stroke. Second, Appellants claim that the hospital owed a duty to protect Shultz from a
_(Footnote Continued Next Page)_

now turn to Appellants' remaining challenges with respect to the trial court's rulings on their motion for summary judgment and the parties' motions *in limine*.

In their first issue, Appellants challenge the trial court's order denying their motion for summary judgment. ***See*** Appellants' Brief at 66-67. Our standard of review is well-settled:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

***Daley v. A.W. Chesterton, Inc.***, 37 A.3d 1175, 1179 (Pa. 2012) (citation omitted).

Herein, Appellants filed their motion for summary judgment asserting that, pursuant to ***Thompson***, York Hospital breached its duty of care as a matter of law by failing to "supervise[] the diagnostic process that was being

---

discharge without the proper medication needed to prevent his second stroke. Here again, Appellants misread ***Thompson***. York Hospital may be liable to Appellants if, and only if, Appellants prove that a departure from one (or more) of the duties enumerated in ***Thompson*** caused Shultz to be discharged without a diagnosis of the cause of his first stroke or caused Shultz to be discharged without the proper medication **and** York Hospital had actual or constructive notice of the defects or procedures which led to Shultz's harm. ***See Whittington***, 768 A.2d at 1149.

performed in the care of . . . Shultz." Appellants' Motion for Summary Judgment, 5/28/21, at 14; *see also id*. at 15. In essence, Appellants contended that York Hospital was liable under a corporate negligence theory because it failed to ensure or enact a policy to make "certain that patients [were] not discharged without a careful review of the [care] provided to them and verifying that all diagnostic tests were performed and acted upon and that all risks of discharge have been evaluated and ruled out or minimized by appropriate planning[.]" *Id.* at 23. To support this claim, Appellants cited various aspects of their expert reports, which they claimed were uncontradicted, as well as certain alleged discovery admissions, and argued that, in light of the foregoing evidence, summary judgment on their claims against York Hospital was appropriate. *Id*. at 18-23. In addition, Appellants sought summary judgment on their vicarious liability claims, similarly arguing that no issues of material fact existed and that, based upon the negligence of Wellspan Hospitalists' agents and York Hospital's ostensible agents, as detailed throughout the motion, they were entitled to judgment as a matter of law.[9] *Id*. at 26.

On June 25, 2021, Appellees responded to Appellants' motion for summary judgment. In their response, Appellees explained that, considering the conflicting expert reports, there existed outstanding issues of fact

_____

[9] In developing their claims before this Court, Appellants refer only to York Hospital. Nonetheless, as Appellants moved for complete summary judgment, not partial summary judgment, we will construe Appellants claims as if set forth against both York Hospital and Wellspan Hospitalists.

regarding the care provided to Shultz. *See* Appellees' Brief in Support of Appellees' Response in Opposition to Appellants' Motion for Summary Judgment, 6/28/21, at 8-10. In addition, Appellees argued that Appellants included only "[s]elf-serving testimony" and, thus, Appellants' brief "materially misrepresented" the discovery deposition testimony offered by both fact and expert witnesses. *Id.* at 11-12. Appellees therefore claimed that no "discovery admissions" occurred. *Id.* Finally, Appellees argued that Appellants and "their experts incorrectly interpret[ed] the accepted standard of care under corporate negligence" because they essentially sought to hold York Hospital liable

> for failing to supervise its medical providers by directing or overriding their clinical judgment and to have policies or procedures in place to ensure this level of . . . 'point of care' supervision over treating providers, regardless of their clinical judgment based upon the objective findings from radiology, labs, and physical examinations.

*Id.* at 13. Appellees claimed this Court recently "explained [in *Ruff* that] the doctrine of corporate negligence does not require a hospital to direct or override its' providers clinical judgment." *Id.* at 14; *see also Ruff*, 257 A.3d at 53-54. Because Appellants' counsel also served as counsel for the plaintiff in *Ruff*, Appellees argued the failure to disclose this binding precedent warranted the issuance of sanctions. On September 10, 2021, the trial court denied Appellants' motion for summary judgment, stating that issues of fact remained, rendering summary judgment inappropriate.

We conclude that the trial court correctly denied Appellants' motion for summary judgment. While Appellants asserted that their expert opinions were uncontradicted, upon review, the parties' experts clearly disputed the cause of Shultz's medical issues and whether Appellees did, in fact, provide deficient care. **See** Appellees' Brief in Support of Appellees' Response in Opposition to Appellants' Motion for Summary Judgment, 6/28/21, at 8-10. Because issues of fact existed, Appellants were not entitled to judgment as a matter of law.

In Appellants' second issue, they challenge the trial court's May 11, 2022 omnibus order, ruling on the parties' various motions *in limine*. Appellants' Brief at 67-71. "When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review." **Commonwealth v. Ivy**, 146 A.3d 241, 250 (Pa. Super. 2016) (citation omitted). An error of law constitutes an abuse of discretion. **Nat'l Cas. Co. v. Kinney**, 90 A.3d 747, 753 (Pa. Super. 2013) (citation omitted).

Appellants' first challenge revolves around the trial court's disposition of Appellees' motion *in limine* in which Appellees argued that, in addition to Dr. Brady, Appellants' other experts, namely, Stephen H. Broomes, M.D., Dr. Larkin, and Dr. Altafullah, claimed that York Hospital "breached the standard of care and [is] liable for corporate negligence." Appellees Omnibus Motion *in Limine*, 4/6/22, at 10. Appellees, therefore, claimed that Drs. Broomes, Larkin and Altafullah's proposed expert testimony was "cumulative" and must be limited as such. **Id.** On appeal, Appellants claim that the trial court erred in granting Appellees' motion, arguing that it inappropriately "blocked and

prohibited . . . [their] expert witnesses and their testimony" supporting Appellants' claim of corporate negligence against York Hospital. Appellants' Brief at 70.

The trial court, however, did not grant Appellees' motion *in limine* on this basis. In its omnibus order, the trial court stated:

> [Appellees'] fifth motion is styled as seeking to bar cumulative testimony as to corporate negligence. **We disagree with [the styling of Appellees' motion] in that form** but find the nature of the objection to be proper and consistent with the remaining parts of this [o]rder. Drs. Larkin, Broomes, and Altafullah are precluded from testifying as to any type of corporate negligence which is not specifically based on one of the enumerated duties set forth in [**Thompson**, **supra**,] and within the fair scope of their respective report[s.]

Trial Court's Omnibus Order, 5/11/22, at 5 (emphasis added). Contrary to Appellants' claim, the trial court permitted Drs. Larkin, Broomes, and Altafullah to offer their expert opinions regarding York Hospital's alleged corporate negligence. The court simply required them to confine their testimony to the four distinct duties outlined in **Thompson** and their respective expert reports. Further, as will be discussed in greater detail below, we consider whether Drs. Larkin and Altafullah's expert testimony sufficiently supported Appellants' corporate negligence claim against York Hospital.[10] Thus, Appellants claim is not only meritless, but also belied by the record.

_____

[10] Ultimately, Dr. Broomes was not called as a witness during Appellants' case-in-chief.

- 20 -

In addition, Appellants argue that the trial court erred in granting Appellees' motion *in limine* which precluded Dr. Brady from "reading [] or citing" the Advisory during his testimony. Appellants' Brief at 68; ***see also Ruff***, 257 A.3d at 59 (explaining that the Advisory is a publication issued by the Pennsylvania Patient Safety Authority, which was created under the Medical Care and Reduction of Error Act, 40 P.S. § 1303.301. *et. seq.*, and "related to the reduction of medical errors for the purpose of ensuring patient safety"). In particular, Appellants claim the trial court's ruling was error because the Advisory was independently admissible, either to prove notice or because the Advisory constituted a public record which is an exception to the hearsay rule. Appellant's Brief at 69.

Hearsay, as defined by Pa.R.E. 801(a)-(c), is a declarant's out-of-court statement or assertion offered into evidence to prove the truth of the matter asserted. ***Id.*** If a statement is hearsay, it is generally inadmissible. Pa.R.E. 802. If, however, a statement or assertion is offered "for a purpose other than to prove the truth of the matter asserted," such as notice or warning, it is not hearsay and, as such, is admissible. Pa.R.E. 801, comment. In addition, there are numerous exceptions to the prohibition against hearsay, as outlined in Pa.R.E. 803.

This Court previously addressed an expert's ability to testify about reports or opinions that would otherwise be barred as hearsay. We stated:

Pennsylvania Rule of Evidence 703 provides the following:

**Rule 703. Bases of opinion testimony by experts**

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703 ([emphasis omitted]).

While it is true that "an expert may not act as a 'mere conduit or transmitter of the content of an extrajudicial source[,]'" *Woodard v. Chatterjee*, 827 A.2d 433, 444 (Pa. Super. 2003), there is a well-settled exception to the hearsay rule in which an expert may express an opinion based, in part, upon reports or the opinions of other experts provided such reports or opinions are of a type customarily relied upon by experts in the field. *Primavera v. Celotex Corp.*, 608 A.2d 515, 521 (Pa. Super. 1992). In sum:

> An "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination. The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where . . . the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience, . . . the expert's testimony should be permitted.

*Id.* (footnote omitted).

*Nazarak v. Waite*, 216 A.3d 1093, 1108 (Pa. Super. 2019) (parallel citations omitted).

In their motion *in limine*, Appellees requested the trial court to "preclude Dr. Brady from reading [] or citing the [Advisory]." Appellees Omnibus Motion *in Limine*, 4/6/22, at 8. Appellees claimed that, in **Ruff**, this Court affirmed the trial court order granting a similar defense motion and prevented Dr. Brady from "introducing the [Advisory] into the record in its entirety" during his testimony. **Id.** at 9. Based upon the foregoing, Appellees requested the trial court in the instant matter to similarly limit Dr. Brady's testimony, *i.e.*, allow Dr. Brady to "testify that he relied on the [Advisory] in reaching his opinion, but [preclude] the document [from being] introduced [into evidence] in its entirety." **Id.**

In response to Appellees' motion, Appellants stated:

> It is submitted that the contents of the [Advisory] provide[] important information concerning the danger of delayed or missed diagnostic errors which is an important part of [Appellants'] corporate negligence claims in this case.

> The information contained in the Advisory is specifically relevant to the concept of giving notice to York Hospital concerning the dangers involving not complying with the duty to promulgate appropriate policies and rules.

> ***

> [Dr. Brady's] use of the [Advisory] should permit him not only to indicate that he relied on this publication in forming an opinion, but also [to point] out how this publication has special significance as notice to the hospital of what is required to comply with the corporate standard of care to ensure the safety and wellbeing of patients while in hospitals and how to perform the third and fourth duties set forth in [**Thompson**.]

Appellants' Brief in Opposition to Appellees' Omnibus Motion *in Limine*, 4/18/22, at 31-33. Hence, Appellants asked that Dr. Brady be permitted to

testify, in detail, regarding the contents of the Advisory to enable them to establish their claims of corporate negligence against York Hospital namely, the requisite standard of care and notice.

Ultimately, the trial court issued the following order regarding Dr. Brady's use of the Advisory:

> [Appellees'] second, third and fourth motions seek to preclude [Dr.] Brady[,] a proffered expert witness, from . . . introducing the [Advisory.] … [W]hile an[] expert can rely upon materials such as the [Advisory], they cannot be a conduit for the introduction of the work which would otherwise be barred by the hearsay rule. Thus, Dr. Brady can certainly make reference to the Advisory through the course of his testimony, but he may not read from it at length, nor will it be introduced as independent evidence in this matter.

Trial Court's Omnibus Order, 5/11/22, at 4. In issuing this ruling, the trial court clearly considered the Advisory to be inadmissible hearsay. Specifically, the court considered the Advisory to be a learned treatise, which is inadmissible in Pennsylvania. **See** N.T. Trial, 6/13/22-6/17/22, at 649 (the court stating: "We [are] not going to get into the nature of the document again because I believe I [have] made it clear that for purposes of examining the witness, it is to be treated as a learned treatise[.]"); **see also** Pa.R.E. 803 (18), cmt. ("Pennsylvania has not adopted F.R.E. 803(18). Pennsylvania does not recognize an exception to the hearsay rule for learned treatises."). Hence, the trial court held that Dr. Brady was permitted to reference the Advisory as a basis for his opinion, but he was not permitted to "act as a 'mere conduit or transmitter of [its content].'" **Woodard**, 827 A.2d at 444; **see also Aldridge**

- 24 -

*v. Edmunds*, 750 A.2d 292, 298 (Pa. 2000) (explaining that, while "judicious use of learned treatises may be made on direct examination of an expert witness in appropriate circumstances for the limited purpose of explaining the basis for the opinion," a trial court must "impose appropriate constraints"). Accordingly, because the trial court considered the Advisory to be a learned treatise, it allowed Dr. Brady to reference the Advisory during his testimony but prohibited him from reading it "at length." Trial Court's Omnibus Order, 5/11/22, at 4.

Herein, we initially conclude that Appellants' present claim of error, which alleges that the Advisory is independently admissible as a public record, is waived. Upon review, it is apparent that Appellants never raised this issue in a pre-trial motion *in limine* or in their opposition to Appellees' omnibus motions in *limine*. Instead, the first time Appellants referenced the independent admissibility of the Advisory as a public record was briefly during trial when Appellants responded to Appellees' counsel's objection to the introduction of its contents during Dr. Brady's testimony. **See** N.T. Trial. 6/13/22-6/17/22 at 648. In particular, following Appellees' objection, Appellants' counsel stated:

> [**Aldridge**, **supra**, is inapplicable because it] was dealing with learned treatises, individuals or a number of individuals who write about medicine. This is something different. It [is] a governmental publication.

**Id.** Thus, the only time Appellants claimed the Advisory was a public record before the trial court was during trial, after the court already ruled on the

parties' motions *in limine* and, even then, only through a passing statement, without an offer of proof.  Appellants seemingly concede this fact on appeal because, in their appellate brief, they claim they "clearly notified" the trial court that the Advisory "was a governmental report" in their "1925(b) filing." Appellants' Brief at 69; ***see also*** Pa.R.A.P. 1925(b).  Because Appellants first presented the Advisory as a public record in their 1925(b) statement and on appeal, this claim is waived.  ***See*** Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

We also conclude that the trial court did not abuse its discretion by treating the Advisory as an inadmissible learned treatise or by limiting Dr. Brady's testimony on this basis.  While Appellants argued that the Advisory was admissible to prove "notice" and, ostensibly, that it was admissible for non-hearsay purposes, Appellants response to Appellees' omnibus motion *in limine* belies this claim, as Appellants admit they contemplated a broader use of the document in that they sought to introduce the Advisory to establish their corporate negligence claim against York Hospital.  Indeed, Appellants requested the trial court to permit Dr. Brady to relay the contents of the Advisory to the jury so they could establish "how to perform the third and fourth duties set forth in [***Thompson***]."  Appellants' Brief in Opposition to Appellees' Omnibus Motion *in Limine*, 4/18/22, at 31-33.  Hence, Appellants undoubtedly sought to offer the Advisory into evidence, not merely as proof of notice, but as substantive evidence supporting their claim that York Hospital breached one or more of its duties under ***Thompson***.

Moreover, the trial court's decision to treat the Advisory as a learned treatise and, as such, inadmissible hearsay, is supported by this Court's decision in *Ruff*. In *Ruff*, this Court confronted this exact issue, with the exact same Advisory, and the exact same expert witness, Dr. Brady. *See Ruff*, 257 A.3d at 59 (stating that the appellant asked the Court to consider whether the trial court erred in granting York Hospital's "motion *in limine* [] request[ing] the court to preclude [the a]ppellant's expert, Dr. Brady, from referring to the [Advisory]" during his testimony). Ultimately, the *Ruff* Court affirmed the trial court's ruling which held that the Advisory constituted a learned treatise, and then precluded Dr. Brady from reading the text of the Advisory during his testimony at trial. *See id.* ("In accordance with *Aldridge*, the trial court permitted [Dr.] Brady to testify that the [Advisory] was authoritative and that he relied upon it when rendering his opinion against York [Hospital]."). Thus, for all of these reasons, we hold that Appellant's claim of error fails.

In Appellants' fourth issue, they argue that the trial court erred in disqualifying their expert, Dr. Brady. Appellants' Brief at 72-78. The trial court dismissed Dr. Brady because he repeatedly read from portions of the Advisory during his expert testimony in violation of the trial court's May 11, 2022 omnibus order. Appellants' claim is meritless.

As this Court previously explained:

> The purpose of pretrial motions *in limine* is to "give[] the trial judge the opportunity to weigh potentially prejudicial and

> harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury."
>
> ***
>
> [As such, t]he grant of a motion *in limine* is a court order that must be observed. … Why would counsel ever bother filing such a motion if opposing counsel were free to blithely ignore it without the court's affording any relief to the offended party by way of the grant of a mistrial upon proper application?

***Buttaccio v. Am. Premier Underwriters, Inc.***, 175 A.3d 311, 320–321 (Pa. Super. 2017) (internal citations omitted).

Herein, Appellants do not dispute that Dr. Brady violated the trial court's order and read from the Advisory during his expert testimony. Instead, Appellants, again, argue that the trial court erroneously granted Appellees' motion *in limine* and, as such, erroneously prohibited Dr. Brady from reading from the Advisory at trial. **See** Appellants' Brief at 72-77. As indicated above, however, the trial court correctly limited Dr. Brady's testimony based upon the record before it. Moreover, upon review, it is apparent that Dr. Brady was repeatedly asked about, and detailed the contents of, the Advisory during his testimony, in direct contravention to the trial court's May 11, 2022 omnibus order. **See** N.T. Trial, 6/13/22-6/17/22, at 637-650 and 652-655. In similar circumstances, we have approved more drastic remedies such as orders granting a mistrial. **See Buttaccio**, 175 A.3d at 320-321. Accordingly, we conclude that the trial court did not err in granting Appellees' request and dismissing Dr. Brady as an expert, a "lesser remedy" than ordering a mistrial. ***Factor v. Bicycle Technology, Inc.***, 707 A.2d 504, 506-507 (Pa. 1998).

In Appellants' fifth and sixth issues, they argue that the trial court erroneously granted Appellees' motion for compulsory non-suit. We review a challenge to an order granting or denying a compulsory non-suit as follows:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.
>
> A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Hoffa v. Bimes*, 954 A.2d 1241, 1243 (Pa. Super. 2008) (internal citations, quotations, and corrections omitted).

We first address Appellants' challenge to the trial court's decision to grant compulsory non-suit regarding their corporate negligence claim. As stated above, to sustain a cause of action for corporate negligence, a plaintiff must plead and prove: (1) the hospital breached one of the four specifically enumerated duties in *Thompson*; (2) the hospital had actual or constructive notice of the defects creating the harm; and (3) causation. *See Whittington*, 768 A.2d at 1149. In *Welsh*, our Supreme Court explained that, in general, expert testimony is necessary to sustain a corporate negligence action. It stated:

In a traditional medical malpractice action, where the defendant's negligence is not obvious, a plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered. *Mitzelfelt v. Kamrin*, 584 A.2d 888 (Pa. 1990); *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978). The Commonwealth Court has determined that this expert testimony requirement is equally applicable to claims of corporate negligence where the hospital's negligence is not obvious. *Walls v. Hazleton State Gen. Hosp.*, 629 A.2d 232 (Pa. Commw. 1993). We believe the Commonwealth Court's determination is sound, and accordingly, we hold that, unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff. We do not, however, require experts to use "magic words" when expressing their opinions. *Mitzelfelt, supra*. Instead, we look at the substance of their testimony. *Id.*

*Welsh*, 698 A.2d at 585-586.

At trial, Appellants sought to establish a *prime facie* case of corporate negligence based upon a violation of the third and fourth duties outlined in *Thompson*, 591 A.2d at 707 (explaining that a hospital owes patients "a duty to oversee all persons who practice medicine within its walls as to patient care" and "a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients."). The trial court granted non-suit because it determined Appellants failed to present expert testimony to support their claim of corporate negligence under either theory. Specifically, in its 1925(a) opinion, the trial court stated:

As to direct corporate liability, [Appellants] attempted to call only one expert witness to prove corporate liability. We must say "attempted" to call the witness, as when Dr. Brady was

called as a witness[,] he was not qualified as an expert in the area of corporate liability. Accordingly, regardless of the other issues regarding Dr. Brady's testimony discussed above, [Appellants] failed to provide any expert testimony opining [that] York Hospital breached one of the necessary duties to establish corporate liability.

In our May 11, 2022, [o]mnibus [o]rder[,] we opined that [Appellants] would be required to provide expert testimony to establish corporate negligence. … Here, the alleged corporate negligence was not "obvious." Thus, [Appellants were] required to produce expert testimony to establish corporate negligence. [They] failed to produce such an expert[] and[,] therefore, there was no factual basis to send that claim to the jury. Accordingly, we did not error in granting non[-]suit in favor of York Hospital on [Appellants'] corporate liability claim.

Trial Court Opinion, 8/12/22, at 15-16 (footnote and internal citations omitted).

We initially address Appellants' claim that York Hospital violated the fourth **Thompson** duty, *i.e.*, that York hospital failed to create policies and procedures to ensure patients' quality care. **See Thompson**, 591 A.2d at 707. A review of the trial transcripts reveals that Appellants sought to offer Dr. Brady's expert testimony to support this claim. **See** N.T. Trial, 6/13/22-6/17/22, at 603 and 647-648. No other experts testified in support of this claim. As outlined above, however, Dr. Brady was disqualified as an expert witness and his testimony stricken from the trial court record.[11] Without Dr. Brady's expert testimony, we conclude that Appellants failed to present sufficient evidence to sustain their claim that York Hospital violated

---

[11] We previously determined that the trial court acted within the bounds of its discretion in dismissing Dr. Brady as an expert witness as a sanction for his violation of the trial court's pre-trial order May 11, 2022. **See**, **infra.**

the fourth **Thompson** duty and, in turn, caused Shultz's injury. **See Welsh**, 698 A.2d at 585-586.

We now turn to Appellants' contention that York Hospital violated the third **Thompson** duty, *i.e.*, the duty to "oversee all persons who practice medicine within its walls as to patient care." **Thompson**, 591 A.2d at 707. At trial, Appellants sought to establish that, to uphold its duty of oversight, York Hospital needed to implement point of care supervision. **See** Appellant's Brief at 31 (arguing that **Thompson**'s oversight duty required York Hospital "to act [to protect Shultz] from a missed diagnosis of the cause of his stroke [on September 25, 2014] and to [ensure that Shultz] receive[d] proper treatment to avoid [his] second stroke."). Indeed, Appellants claimed York Hospital was required to ensure (1) that all appropriate tests were administered (a right leg ultrasound and a transesophageal echocardiogram); (2) that York Hospital's providers discovered that Shultz had a DVT and a PFO; and, finally, (3) that York Hospital administered Shultz a blood thinner before discharge, as opposed to an aspirin. Appellants claim that implementation of such supervisory measures would have prevented Shultz's second stroke on September 27, 2014.

As indicated previously, Appellants presented multiple expert witness during their case-in-chief, in addition to Dr. Brady. We consider, therefore, whether the testimony of Appellants' experts, Drs. Altafullah and Larkin, supported each of the essential elements of a corporate negligence claim, *i.e.*,

whether Drs. Altafullah and Larkin offered expert testimony regarding the standard of care and causation.[12]

First, Dr. Altafullah testified, in relevant part, as follows:

Q. Doctor, what was the standard of care for treatment in 2014?

A. Yes. Actually, that [is] a very easy answer. It was the same standard in 2014 as it is now, vis-à-vis this situation. The recommendation for anticoagulation in the setting of [DVT], pulmonary embolism, and PFO in 2014, and this is part of the guidelines of the American Heart and Stoke Association, in 2014 was to anticoagulate the patient.

By the way, this was a level 1A recommendation. Now, what that means is there are various grades of recommendations. Level 1A is the highest quality of recommended anticoagulation for someone with a PFO and a [DVT], paradoxical embolism, and stroke. That has not changed.

Q. Doctor, do you have an opinion based upon your review of the records and based upon your experience whether or not the stroke care providers in providing care to [] Shultz fell below the appropriate standard of care in his diagnosis and treatment?

A. At the end, there were some errors of omission. As I said, the doctors who saw him were right on target with their hypothesis generation when he first came. If you read Dr. Mingle's note, he lays out all these possibilities. For some reason, the plan was not executed appropriately.

Q. I [am] going to ask the question again. Did the physicians treating [] Shultz on his first visit to [York H]ospital comply with the standard of care and provide him with good and accepted treatment practices in [accordance with their] diagnosis and treatment of the stroke?

A. I would say they did not. As I said, there were omissions that could have led to a very different course of action. And so

---

[12] **Welsh** expressly mandated expert testimony to establish only the **first** and **third** prongs of a corporate negligence *prima facie* case. **See Welsh**, 698 A.2d at 585-586.

while it pains me to say it about colleagues, I think there were some omissions there that fell below the standard of care.

Q. Did the failure to provide a test to determine whether or not there was DVT in his leg increase the risk of harm to this patient?

A. Yes.

Q. And did it fall below the standard of care of good and accepted practices not to perform a DVT test with an ultrasound?

A. In the context of the recent sclerotherapy, the answer is yes, that should have been done.

Q. And was it below the standard of care not to perform a transesophageal echocardiogram on [] Shultz before discharging him from the hospital?

A. Yes, it was.

Q. Did that—

A. As I said before, after the transthoracic had been done and the ultrasound had been done and there were no answers as to why he had had a stroke, that should have been done.

Q. And why is that?

A. Well, as I said, you know, there [is] a hierarchy of tests. You do [not] do every test on everybody, but you [have] got to go through. And so even with the reference to the [DVT] test, compression venous ultrasound, you would [not] do it on everybody, but you do it as somebody who had sclerotherapy the day before who had a stroke. You [have] got to think this through a little bit.

He just had a procedure in his leg injecting foam and doing radiofrequency ablation. We know that can predispose to a [DVT]. Okay? So if you are not finding an arterial source of stroke, if you are not finding significant carotid disease, if you are not finding significant small vessel disease on his MRI, why did he have a stroke? You have to try and answer that question. And it was [not] that difficult. It was a matter of doing an ultrasound and another echo, which was ultimately done and did give the answer a few days later.

Q. And that would have indicated he should have been given anticoagulant medication before he was discharged as part of the discharge?

A. That is my opinion, correct.

Q. And is your opinion based upon reasonable medical certainty?

A. Yes.

Q. I have to ask you another question concerning causation. Do you have an opinion on whether or not the failure to provide good and accepted care to these patients increased the risk of harm of a second stroke?

A. Yes.

Q. Did that second stroke occur?

A. Yes.

Q. And it is your opinion that there was a second stroke; is that correct?

A. Absolutely.

N.T. Trial. 6/13/22-6/17/22, at 246-250.

Thereafter, Dr. Larkin provided the following relevant testimony:

Q. Do you, based on your education, training, and experience, have an opinion as to the cause of the stroke suffered by [] Shultz on September 25th and 27th?

A. I do.

Q. And what is that opinion?

A. His stroke was caused by blood clots that complicated his vein procedure that embolized to the right heart. Some of them went through the lungs, and some of them went through – or one of them went through the PFO that caused his first stroke. And then his second stroke was caused by the same mechanism with a second blood clot that was much larger than the first.

Q. And is your opinion based upon reasonable medical certainty?

A. It is.

Q. Okay. I [am] going to ask the same question a different way. Do you have an opinion concerning whether or not the strokes that were diagnosed in [] Shultz's hospitalization were two separate events caused by the passage of emboli through the PFO to the brain?

A. I do.

Q. And what is that opinion?

A. There were two separate events and two separate emboli that passed through the PFO.

Q. Okay. I [am] going to repeat myself here because the basis for that opinion you have already shown us, right, that there was a wide open middle cerebral artery, and then there was a --- the second time it was closed.

A. Right.

Q. Is that right?

A. That [is] right.

Q. Do you have opinions stated to a reasonable degree of medical certainty concerning your review of the medical record and whether the individual health care providers who were providing stoke care to Fred Shultz acted in a manner that was below the standard of care?

A. I do.

Q. And what is that? What deviations do you find?

A. Well, number one, despite knowing that the stroke could have been due to the brain – to the vein procedures with a PFO, they did [not] investigate that possibility. They did [not] do the appropriate test, the transesophageal echo, which would have diagnosed [] Shultz's large PFO that he had at the time of the vein procedure. That went undiagnosed before he was discharged the first time. So that was below the standard of care because the treatment would have been different.

Had they known there was a PFO and blood clots were being thrown through the PFO, he would have been put on a blood thinner, and it [is] highly likely the blood thinner would have

prevented the second stroke. Sending him home on an aspirin is woefully inadequate for this type of situation.

Q. That falls below the standard of care?

A. Yes.

Q. And does it increase the risk of a second stroke?

A. Yes.

Q. Based upon your training, education, and experience, is the discharge of [] Shultz from this hospital without a diagnosis of the cause of his stroke a departure from good and accepted standards of practice?

A. Yes.

Q. And did that increase the risk of harm to him?

A. Yes.

Q. And did that harm occur?

A. Yes.

Q. How?

A. He had a second stroke because he was unprotected against the second stroke because his diagnosis was [not] made before they discharged him the first time.

Q. Was it below the standard of care not to provide anticoagulant medication to him rather than an aspirin?

A. Yes.

Q. And did that increase the harm that did occur to him?

A. Yes.

*Id.* at 423-427.

The foregoing exchanges illustrate that the substance of Drs. Altafullah's and Larkin's expert testimony pertained to Appellants' claims that York Hospital breached ***Thompson***'s oversight duty in failing to ensure that (1) all

appropriate tests were administered (a right leg ultrasound and a transesophageal echocardiogram); (2) York Hospital providers discovered that Shultz had a DVT and PFO; and (3) York Hospital providers prescribed anticoagulants to Shultz upon discharge. We therefore conclude that Appellants did, in fact, present expert testimony in support of their corporate negligence claim against York Hospital. We must now determine whether, in light of the aforementioned expert testimony, Appellants presented sufficient evidence to establish a claim of corporate negligence based upon a violation of the third **Thompson** duty; *i.e.* "a duty to oversee all persons who practice medicine within its walls as to patient care." **See Thompson**, 591 A.2d at 707.

Importantly, in a recent decision issued by this Court, we explained the type of evidence a plaintiff must present to sustain a cause of action of corporate negligence based upon an alleged violation of **Thompson**'s oversight duty. **See Corey v. Wilkes-Barre Hospital Company, LLC**, 2023 WL 8535079 *1 (Pa. Super. Dec. 11, 2023) (*en banc*). We recognized that recovery for corporate negligence is limited to instances in which a plaintiff demonstrates "systemic negligence" on the part of a hospital. **Id.** at *8. In other words, a claim for corporate negligence based upon an alleged breach of a hospital's oversight duty cannot be established by evidence of individual decisions made by medical care providers with respect to the care and treatment provided to a particular patient during a limited hospital visit. **Id. See also Welsh**, 698 A.2d at 585 ("A cause of action for corporate negligence

arises from policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees."); ***Boring v. Conemaugh Memorial Hosp.***, 760 A.2d 860, 861 (Pa. Super. 2000) (holding that the plaintiff simply established "that the nurses failed to act appropriately in this case" and failed to show "systemic negligence" on the part of the hospital and, as such, the trial court correctly declined to charge the jury on corporate negligence).  Thus,

> a plaintiff sets forth sufficient evidence to sustain a cause of action of corporate negligence based upon a violation of ***Thompson***'s oversight duty if he or she demonstrates systemic shortcomings in diagnostic or treatment practices, such as where patient care and safety are negligently overlooked and/or ignored despite repeated presentations over extended periods of time until it is too late to act.
>
> \*\*\*
>
> [In general,] this requires a showing of 'numerous and repeated deviations from the standard of care by hospital personnel [because] . . . [s]uch conduct over a period of time would allow health care providers, namely, nurses, sufficient time to observe and 'go to their supervisor[s] and inform [them of the] problem[s] that [] developed' and, in turn, an opportunity for hospital supervisors to implement corrective action. ***Whittington***, 768 A.2d at 1150.

***Corey*** at \*18-\*19 (Concurring Opinion, J. Olson).

When we consider the facts and contentions presented by Appellants in light of the teachings of ***Corey***, we are compelled to conclude that the trial court correctly entered a non-suit on Appellants' claims of negligent corporate oversight.  Appellants' allegations of corporate negligence in this case are based exclusively upon a single admission to York Hospital and the conduct of

its medical personnel on **one** day: September 25, 2014. Indeed, Appellants did not present evidence showing that, over the course of days, weeks, or months, the health care providers at York Hospital engaged in continued and repeated negligence with respect to Shultz's care, including proof tending to demonstrate that he was overlooked and/or ignored as a patient at York Hospital. In other words, Appellants failed to prove that York Hospital had corporate knowledge of recurring departures from the standard of care sufficient to establish "systemic negligence". We therefore conclude that Appellants did not present sufficient evidence to submit a cause of action of corporate negligence against York Hospital to the jury and affirm the trial court's decision to grant York Hospital's motion for non-suit on this basis.[13]

Lastly, we address Appellants' claim that the trial court erred in granting Appellees' request for a compulsory non-suit regarding their vicarious liability claims. The trial court entered a compulsory non-suit because it determined that Drs. Larkin and Altafullah "expressed conflicting opinions as to the standard of care appropriate to Shultz that [were] absolute and in opposition to each other." Trial Court Opinion, 8/12/22, at 16. Upon careful review, we conclude that Drs. Larkin and Altafullah did not provide conflicting expert testimony. As such, the trial court erred in granting Appellees' motion for

---

[13] It "is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself." **Commonwealth v. Lehman**, 275 A.3d 513, 520 n.5 (Pa. Super. 2022) (quotation omitted).

compulsory non-suit with respect to Appellants' vicarious liability claims against Appellees.

In **Mudano v. Phila. Rapid Transit Co.**, 137 A. 104 (Pa. 1927), our Supreme Court held that a plaintiff cannot sustain his or her burden of proof upon the presentation of conflicting expert testimony. In particular, the **Mudano** Court held that if expert testimony is

> so conflicting regarding the proper inference to be drawn as to render either one of two inconsistent inferences possible of adoption, the adoption of the one or the other would be nothing more than a guess, and, under such circumstances, [the] plaintiff fails to sustain the burden of proof which the law casts upon him [or her].

**Id**. at 106. In subsequent decisions, however, our Supreme Court recognized that, since **Mudano**, it "has allowed juries to consider and resolve conflicts among expert witnesses." **Brannan v. Lankenau Hosp.**, 417 A.2d 196, 200 (Pa. 1980) (citing cases). Thus, "relatively minor divergence[s] in only a part of [an] expert's testimony, when viewed against the testimony as a whole" will "not justify removal of [a party's negligence] from jury consideration:" "conflicts in [expert] testimony are fatal only if absolute." **Id.**; **see also Brodowski v. Ryave**, 885 A.2d 1045, 1061 (Pa. Super. 2005) (holding that the experts' testimony "did not present an irreconcilable conflict such that the **Mudano** rule would apply to neutralize their opinions").

Herein, the trial court held that Drs. Altafullah and Larkin presented conflicting testimony regarding the administration of a certain type of anticoagulant, Coumadin. In particular, the trial court stated:

> Dr. Altafullah testified that York Hospital deviated from the standard of care by . . . not administering a B-12 anticoagulant, specifically [C]oumadin. … Dr. Larkin also believed York Hospital should have administered an anticoagulant, but specifically testified it should not have been [C]oumadin, but a different anticoagulant. Dr. Larkin specifically opined to have given [C]oumadin would have also been a deviation from the standard of care.

Trial Court Opinion, 8/12/22, at 17. Based upon the foregoing, the trial court concluded that "the jury had no basis . . . to determine whether York Hospital was to have administered [C]oumadin or some other fast-acting anticoagulant. The jury would have been left to simply speculate." *Id.* at 18.

In contrast to the trial court's conclusion, we find that the opinions set forth by Drs. Altafullah and Larkin regarding the administration of Coumadin or some other anticoagulating agent were not so contradictory to each other, that they left the jury to speculate regarding the standard of care. Drs. Altafullah and Larkin both testified that York Hospital's failure to administer an anticoagulant before Shultz was discharged on September 25, 2014 fell below the standard of care and, if York Hospital administered an anticoagulant, it would have prevented Shultz's second stroke. *See* N.T. Trial, 6/13/22-6/17/22, at 246-247 (Dr. Altafullah testifying that, in 2014, the American Heart and Stroke Association recommended to "anticoagulate [a] patient" in "the setting of [DVT], pulmonary embolism, and PFO"); *see id.* at 256 (Dr. Altafullah testifying that, if Shultz were given an anticoagulant following his first stroke, his second stroke would not have occurred); *see also id.* at 425-426 (Dr. Larkin explaining that Appellees deviated from the

standard of care by not anticoagulating Shultz prior to his discharge and that this failure increased the risk of his second stroke); *see id*. at 405-406 (Dr. Larkin testifying that if Shultz were "anticoagulated instead of just being put on an aspirin" it was "highly likely that would have prevented the second stroke").

In addition, Drs. Altafullah and Larkin consistently testified regarding the administration of Coumadin. The exchanges in question occurred during the doctors' respective cross-examinations. In particular, the relevant portions of Dr. Altafullah's testimony are as follows:

> Q. If one were to determine as a provider that a patient has an embolic stroke and determines that the source of that stroke is from a DVT, a paradoxical stroke from a DVT in the setting of a PFO, in that situation, the treatment, I do [not] like that term, the medication regimen for prophylaxis against recurrent stroke changes from an antiplatelet, like aspirin and a statin, to an anticoagulant and a statin?
>
> A. Yes, that is correct.
>
> Q. All of this is pursuant to the American Stroke Association guidelines, correct?
>
> A. Well, like I said, the guidelines provide the umbrella recommendations, yes. But we individualize treatment all the time. So[,] it [is] not like you can [not] do anything else as long as you can justify it.
>
> Q. Sure. But you actually said that this was level 1A best evidence, correct?
>
> A. That is the recommendation for those set of circumstances, correct.
>
> Q. In that set of circumstances, the anticoagulant that would be given, again, in a patient who's been determined to have a paradoxical embolic stroke due to DVT in the setting of PFO is

an oral anticoagulant, specifically an oral vitamin K antagonist anticoagulant, correct?

A. **Not necessarily**.  So let me tell you what happens. We do one of two things. **We usually use -- if there [is] a high risk, we start off with intravenous Heparin and transition to Coumadin using a bridging drug called Lovenox, or we can start them on a second[-]generation oral anticoagulant such as Eliquis.  In this case, we do not use Heparin or Lovenox bridging.  So[,] there are many different ways of doing this.**

Q. Doctor, the guidelines actually say that in this setting, a provider should use a vitamin K antagonist oral anticoagulant, correct?

A. Correct.

Q. Like Coumadin, correct?

A. Say that again.

Q. Doctor, the ASA, American Stroke Association guidelines, as you said, their level 1A best evidence recommendations for the treatment of a patient who is found to have a paradoxical stroke from a DVT in the setting of a PFO is an oral anticoagulant, specifically a vitamin K antagonist like Coumadin, correct?

A. Correct.

Q. The guidelines do not recommend using Heparin, correct?

*** 

A. They do say that.  They do [not] recommend not to use it either.

Q. Okay, Doctor.

A. You have -- okay.  You have to -- counsel, the decision the other day -- let me finish this up.  You have to make a treatment decision based on the individual circumstances.

Q. Doctor, I just want to make sure I understand this.  The American Stroke Association puts out guidelines based upon what you said is grade level 1A best evidence, and those guidelines specifically say the anticoagulant that you would use is an oral vitamin K antagonist like Coumadin, **and you [are]**

**now saying that because it's silent on whether you can also use Heparin, that's a perfectly fine choice?**

A. **Yeah. Absolutely**.

Q. My goodness. There is actually guidelines that suggest using Heparin in the setting of a stroke would so increase the risk of hemorrhagic conversion that the risk would far outweigh the benefit, correct?

A. Counsel, you should go to a neurology residency for this. This is a very complex issue, and do [not] try to reduce it to two or three lines. Okay? The recommendation -- let me finish now. The recommendation for Heparin – one indication for Heparin is in thrombotic strokes or in large atrial fibrillation caused strokes. Each case is different. We routinely anticoagulate patients with dissections and strokes. We routinely anticoagulated patients with small strokes and venous emboli. So[,] I think if you are going to make those blanket statements, you need to also qualify them. Heparin is not contraindicated in every patient with stroke. It is not indicated in the large body of thrombotic stroke you are talking about. Heparin is not contraindicated stroke, blanket.

Q. Doctor, generally speaking, a provider pursuant to the American Stroke Association guidelines would not routinely anticoagulate stroke patients in the hope of preventing propagation of a stroke, correct?

A. Absolutely. We are not talking about routinely. We are not talking about routine. We are specifically talking about an individual. That [is] the whole point.

Q. And, Doctor, specific to this individual, in the setting of what you have opined is a paradoxical stroke from a DVT in the setting of a PFO, the guidelines specifically say the treatment is a vitamin K antagonist oral anticoagulant like Coumadin, correct?

A. Yes.

Q. Thank you. Can we agree that it takes several days for Coumadin to become therapeutic?

A. Yes. **And that's why we use bridging therapy.**

Q. Doctor, if you look at these guidelines, and trust me, I [have] spent days studying and memorizing these guidelines, if you look at these guidelines, there are other situations where the American Stroke Association actually recommends bridging. This is not one of those situations, correct?

A. **I disagree with you. I completely disagree with you. I am -- if this were my patient, and I [am] under oath, if this were my patient and I were treating him and I found that he had [DVT] and pulmonary emboli and a PFO and a small stroke, I would anticoagulate him with a bridging therapy or a second[-]generation oral anticoagulant.** Period. The guidelines do not prohibit individual decision making based on individual patient characteristics. I [have] said this all along. So[,] I [am] very consistent in my opinion that the guidelines provide an umbrella. They do not dictate every single case that you come across.

N.T. Trial, 6/13/22-6/17/22, at 289-294 (emphasis added).

The relevant portions of Dr. Larkin's testimony are as follows:

Q. Can we agree that the treatment under the American Stroke Association guidelines for a cryptogenic embolic stroke is the same as a thrombotic stroke, being an antiplatelet like aspirin or Plavix?

A. I [am] not that familiar with the guidelines to differentiate the treatment differentiation between a cryptogenic stroke and a thrombotic stroke. It [is] more of a neurology question. And I [am] sure Dr. Altafullah has answered that.

Q. Let me ask this. If -- Coumadin is a vitamin K antagonist anticoagulant, correct?

A. Correct.

Q. Coumadin, per the American Stroke Association guidelines, would be the treatment for someone who has been diagnosed with an ischemic stroke in the setting of a PFO and a DVT. Can we agree to that?

A. **That might be a guideline. But in – that [is] just a guideline. And in certain cases, especially this case, you [would] need to use something to anticoagulate him sooner than five days like Heparin or Lovenox.** Those are

guidelines. That does [not] mean that [is] the way you have to treat the patient. You treat the patient individually according to their needs. A vitamin K agent waiting five days, not really appropriate in [] Shultz's case in my opinion.

Q. Can we agree that if a provider followed the American Stroke Association guidelines for the treatment of certain stroke patients, that that would be within the standard of care?

A. Not necessarily.

Q. Doctor, are you suggesting that a provider cannot rely on the American Stroke Association guidelines regarding the recommendation for treatments of stroke patients?

A. **Guidelines are just guidelines. You have to treat the individual patient.** So[,] you have to take -- each patient is different. And guidelines are guidelines. They are something to kind of get you started, but each patient is different.

Q. Dr. Altafullah yesterday told us that that recommendation under the American Stroke Association guidelines is level 1A best evidence recommendation. Do you disagree with that?

A. I did [not] hear Dr. Altafullah's testimony. I [have] not read his testimony. So[,] I [am] not going to comment on his testimony.

Q. I [am] going to ask you a hypothetical then, which I [am] entitled to do of an expert. If Dr. Altafullah hypothetically responded to one of my questions that way yesterday, would you agree with him or disagree with him?

A. Responded in what way? That it was level 1A evidence?

Q. Yes. That the recommendation for a vitamin K antagonist as the treatment plan for an ischemic stroke patient in the setting of a PFO and DVT was . . . level 1A evidence -- best evidence. Do you agree with that or disagree with that?

*** 

[A]. I [am] not really sure what you are asking. I [am] not really comfortable answering it. Level 1A evidence is the strongest evidence that we have in medicine. Medicine is evidence based, and that's the strongest evidence. So[,] if Dr. Altafullah said level 1A evidence says that something works,

- 47 -

then I would say that's the strongest evidence that there is available. That I can agree with.

\*\*\*

Q. Let me ask it more generally then. Can we at least agree that level 1A evidence is the best evidence that one can have in formulating guidelines or care standards?

A. It is.

Q. Can we agree that Coumadin, as we [have] been discussing here, takes several days to become therapeutic?

A. Coumadin does take several days, yes.

Q. In fact, in this particular case, when [] Shultz began taking Coumadin, it took five days for it to become therapeutic, correct?

A. I did [not] see that, how long it took. I did [not] see his [international normalized ratio] after five days. I believe you because that [is] how long it usually takes.

\*\*\*

Q. I want to assume a hypothetical. I [am] going to assume as part of this hypothetical that your opinion is correct that [] Shultz had two separate strokes. Those two separate strokes happened within 48 hours, correct?

A. Correct.

Q. Even if [] Shultz, when he first arrived at York Hospital's emergency department for the first stroke, even if -- although it clearly would be inappropriate, if the first thing the providers did was put a [five] milligram tablet of Coumadin in his mouth and asked him to swallow it, and did the same thing the next day on [September] 26[,] he still would not be anywhere close to therapeutic on the Coumadin by the time he had, in your opinion, the second stroke, correct?

A. **I think we can agree that Coumadin by itself** would not be the appropriate treatment for Mr. Shultz after the first --

Q. Yes. Coumadin, even if it had been started the very second he came in, would not have prevented what you believe to be a second stroke, correct?

- 48 -

A. **Coumadin would not have, but there are other options that would have prevented -- probably would have prevented the second stroke. So[,] Coumadin by itself, you are right, is not adequate to prevent the second stroke in the first five days**.

Q. And so, again, just to reorient ourselves, if the American Stroke Association guidelines suggest that the treatment for an ischemic stroke patient in the setting of a PFO and a DVT is Coumadin, that standard, that guideline from the American Stroke Association would not have prevented Mr. Shultz's second stroke less than 48 hours later?

A. **Coumadin would not have prevented his second stroke. But, again, those are guidelines just to get started. They do [not] take into account he just had a vein procedure that causes blood clots. They do [not] take into account he had pulmonary emboli in both lungs. If those things are evident, then you put him on a blood thinner that works immediately to prevent the second stroke.**

*Id*. at 470-479 (emphasis added).

It is clear that, during cross-examination of Appellants' experts, Appellees' counsel attempted to pigeonhole them into agreeing that, in a similar situation, *i.e.*, in the setting of a PFO and a DVT, the American Stroke Association called for the administration of Coumadin and that, because Coumadin takes several days to become therapeutic, even if the doctors at York Hospital administered it to Shultz, it would not have prevented his second stroke. Importantly, Dr. Altafullah and Dr. Larkin both agreed that Coumadin, alone, would not have prevented Shultz's second stroke for this very reason. In recognition of this fact, both experts called for the administration of an anticoagulant like Heparin or Lovenox at the outset, as well as the administration of Coumadin, and opined that, if York Hospital had taken this

- 49 -

approach, it would likely have prevented Shultz's second stroke.[14] Accordingly, Appellants' experts did not provide conflicting testimony and the trial court erred in granting Appellees' non-suit on this basis.

We reverse the trial court's order granting Appellees' motion for compulsory non-suit on Appellants' vicarious liability claim. We therefore remand for a new trial. We, however, affirm the trial court's orders in all other respects, including its orders regarding the parties' motions *in limine*, Appellants' motion for summary judgment and Appellees' motion for compulsory non-suit on Appellants' corporate liability claims against York Hospital.

_____

[14] In their motion for compulsory non-suit, as well as on appeal, Appellees argue that Appellants' vicarious liability claims also failed because they could not establish causation. In particular, Appellees point to the fact that Appellants' experts, specifically, Dr. Larkin, testified that "Coumadin by itself . . . is not adequate to prevent the second stroke in the first five days." N.T. Trial, 6/13/22-6/17/22 at 478; *see also* Appellees' Brief at 30. As indicated above, Appellees' claim regarding Dr. Larkin's testimony is correct, but it also fails to recognize that both Dr. Larkin and Dr. Altafullah consistently testified that if Appellees administered Coumadin, in addition to another anticoagulant like Heparin or Lovenox, Shultz would not have suffered his subsequent stroke. *See* N.T. Trial, 6/13/22-6/17/22 at 289-294 and 470-479. Hence, Appellants' experts consistently testified that Appellees' agents and ostensible agents acted negligently by failing to administer Coumadin and another, fast acting anticoagulant, and that this failure caused Shultz's second stroke. If Appellees' counsel wishes to rely upon the guidelines of the American Stroke Association as setting forth definitive parameters for patient care, he may do so but, in the circumstances, it seems that any argument which emphasizes deviations from the guidelines goes more to the weight of the expert's testimony and does not establish grounds for a non-suit based upon alleged irreconcilability of the opinion evidence.

Judgment affirmed, in part, reversed, in part.  Case remanded for a new trial.  Jurisdiction relinquished.

Judge Kunselman files a Concurring Memorandum in which President Judge Panella joins.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/16/2024